## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **SHEILA M. GARCIA RIVERA** | |
| Plaintiff, | **CASE NO. 3:25-cv-1056** |
| v. | |
| **BALCHEM CORP.,** **STERI-TECH, INC.,** and **MAYS CHEMICAL COMPANY OF PUERTO RICO, INC.** | |
| Defendants. | **JURY TRIAL DEMANDED** |

## COMPLAINT FOR
## THE FOLLOWING CAUSES OF ACTION

**COUNT I: Violation of the Clean Air Act - 42 U.S.C. § 7604**
**COUNT II: Negligence**
**COUNT III: Strict Liability - Ultrahazardous Activity**
**COUNT IV: Strict Liability - Failure to Warn or Instruct - 31 L.P.R.A. § 5141**
**COUNT V: Strict Liability – Design Defect - 31 L.P.R.A. § 5141**
**COUNT VI: Negligent Design Defect - 31 L.P.R.A. § 5141**
**COUNT VII: Battery**
**COUNT VIII: Private Nuisance - 32 L.P.R.A. § 2761**
**COUNT IX: Trespass**
**COUNT X: Restitution – Unjust Enrichment**
**COUNT XI: Punitive Damages - 31 L.P.R.A. § 10803**

## NATURE OF THE ACTION

1.    For over 35 years, Ethylene oxide ("EtO"), officially recognized as a human carcinogen by the Environmental Protection Agency ("EPA")[1], has been continuously released into the air in Salinas, Puerto Rico, impacting the health and well-being of nearby residents. The main source for these emissions has been identified by the EPA as a sterilization facility owned and operated by Steri-Tech, Inc. Recent investigations reveal a disturbing pattern: communities suffering the most from exposure to toxic EtO emissions in America are at or below the federal poverty line.[2] These communities, already vulnerable, bear the brunt of the health hazards from a pollutant they have little to no role in producing and are often kept in the dark about the greatest health threat lurking in their air.

2.    The health implications of continuous EtO exposure are significant and well documented, encompassing a wide range of cancers such as breast, stomach, pancreatic, brain, leukemia, and lymphoma, along with reproductive issues and miscarriages. For children, who are more vulnerable to the impacts of EtO, the stakes are even higher, with EtO exposure increasing the risk of severe DNA mutations.[3] Even short-term exposure to this toxin can initiate a slew of symptoms like respiratory issues, nausea, headaches, fatigue, and neurological disorders.

3.    Plaintiff, Sheila M. Garcia Rivera, has lived within 1000 feet from Steri-Tech from 1986 to 2012 and within one mile of the facility since 2012. In 2019, she was diagnosed with breast

---

[1] U.S. Envtl. Prot. Agency, *Our Current Understanding of Ethylene Oxide (EtO)*, April 3, 2024, available at: https://www.epa.gov/hazardous-air-pollutants-ethylene-oxide/our-current-understanding-ethylene-oxide-eto    (last accessed January 3, 2025, at 4:26 PM)

[2] Adrian Wood & Marilyn Howarth, *How Federal and State Regulatory Systems Perpetuate Environmental Injustice in the United States: Industrial Ethylene Oxide Emissions as a Case Study*, Environ Justice. 2023;16(4), p. 297-308, available at: https://pmc.ncbi.nlm.nih.gov/articles/PMC10443120 (last accessed January 3, 2025, at 5:21 PM)

[3] U.S. Envtl. Prot. Agency, *Our Current Understanding of Ethylene Oxide (EtO)*, *supra* note 1.

cancer. This complaint seeks injunctive relief and a declaratory judgment under the citizen suit provision of the Clean Air Act, damages on Ms. Rivera's behalf, and compensation for medical expenses and other harms suffered due to her prolonged exposure to EtO emissions.

## INTRODUCTION

4.     This action arises from the foreseeable contamination of air surrounding the Steri-Tech facility due to its use of EtO.

5.     EtO was first listed in the *Fourth Annual Report on Carcinogens* in 1985 as reasonably anticipated to be a human carcinogen, based on evidence from studies in both humans and experimental animals. It was later classified as "known to be a human carcinogen" in the Ninth Report on Carcinogens in 2000.

6.     Despite the ultrahazardous dangers, Defendants disregarded EtO's harmful properties as an environmental toxin, resulting in dangerous volumes of EtO being released into the surrounding communities.

7.     For decades, Defendants have emitted, continue to emit, and/or have caused to be emitted substantial quantities of EtO from the Steri-Tech facility into the surrounding Salinas community, significantly increasing the risk of cancer, including breast cancer, among local residents.

8.     Defendants never informed Ms. Garcia Rivera that they systematically emit EtO into the air, nor did Defendants warn Ms. Garcia Rivera that she routinely and continuously has been breathing in a known human carcinogen.

9.     Ms. Garcia Rivera was unaware that she was being exposed to toxic EtO emissions for decades.

10.     Through their industrial processes, Defendants worked in concert to emit EtO into the air, allowing it to be carried by the wind and natural air movement throughout the area surrounding the Steri-Tech facility. As such, residents in the area have unknowingly been exposed to carcinogenic EtO—at levels 600 times the national average cancer risk.

11.     At all relevant times, the Defendants knew, or should have known, that EtO is dangerous, toxic, carcinogenic, mutagenic, and causes various illnesses. There is no known safe level of EtO exposure; its carcinogenic and DNA-damaging effects have been widely studied and known since the 1940s and definitively known to Defendants since at least 1985. Notwithstanding, Defendants chose to operate their businesses in a way such that EtO is emitted in a densely populated area full of children, houses, parks, schools, and businesses.

12.     On February 7, 2023, the Union of Concerned Scientists published an intensive report ("USC report") on the exposure of EtO to communities in Puerto Rico.

13.     The Union of Concerned Scientists found that the maximum cancer risk levels from Defendants' EtO emissions are 6,000 cases per 1 million people.

14.     EtO exposure is particularly dangerous due to its ability to cause severe DNA damage, even at low levels of exposure. It is linked to cancers such as breast, leukemia, and lymphoma, among others, and poses serious risks to reproductive health.

15.     Ms. Garcia Rivera seeks compensation for her physical injuries, emotional distress, and medical expenses resulting from her exposure to EtO, as well as punitive damages due to Defendants' reckless disregard for public health.

## **PARTIES**

16.     **Plaintiff**: Sheila M. Garcia Rivera is a natural person and a resident of Salinas, Puerto Rico.

17.     Ms. Garcia Rivera resided in the *La Margarita* community in Salinas, Puerto Rico since 1978. In 1986, Steri-Tech started sterilization operations utilizing EtO less than 1000 feet from her home. In 2012 she moved to a home less than one mile from Steri-Tech. She was diagnosed with breast cancer in 2019, a condition attributable to her prolonged exposure to EtO emissions from Steri-Tech's facility.

18.     **Defendants** The term "Defendants" refers to all Defendants named herein jointly and severally.

19.     **Defendant Balchem Corp.** ("Balchem") is a Maryland corporation with its principal place of business in Montvale, New Jersey. Balchem manufactures EtO, which is used in the sterilization processes at Steri-Tech.

20.     **Defendant Steri-Tech, Inc.** ("Steri-Tech") is a Puerto Rican corporation operating a sterilization facility in Salinas, Puerto Rico. Since 1986, Steri-Tech has emitted substantial amounts of EtO into the surrounding community, where Ms. Garcia Rivera resides.

21.     **Defendant Mays Chemical Company of Puerto Rico, Inc.** ("Mays") is a Puerto Rican corporation that distributes EtO to Steri-Tech, enabling its use in the sterilization process and contributing to the harmful emissions affecting nearby residents.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case arises under the laws of the United States, the Clean Air Act, 42 U.S.C. § 7401 et seq. The Clean Air Act provides for a private right of action under 42 U.S.C. § 7604, giving Ms. Garcia Rivera standing to bring this claim. The Court also has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367, as they are part of the same case or controversy under Article III of the United States Constitution.

23.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Ms. Garcia Rivera's claims occurred in this District, and Defendants conduct business here.

## FACTUAL ALLEGATIONS

I.    **Ethylene Oxide is an Ultrahazardous Toxin**

24.    EtO is a highly reactive, colorless, and flammable gas used extensively in industrial sterilization processes. Commercial / industrial medical-equipment sterilizers use EtO in their sterilization processes.

25.    Through its industrial processes, Steri-Tech emitted EtO into the air, allowing it to be carried by the wind and natural air movement throughout the area surrounding the facilities.

26.    EtO has been linked to various forms of cancer, including breast cancer, non-Hodgkin's lymphoma, multiple myeloma, and lymphocytic leukemia.

27.    EtO is highly reactive, readily taken up by the lungs, efficiently absorbed into the blood stream, and easily distributed throughout the human body.

28.    Notwithstanding, for decades, Defendants chose to operate their businesses such that the supply chain culminates in the emission of EtO in the densely populated Salinas area full of children, houses, parks, schools, and businesses, significantly increasing the risk of these Puerto Ricans contracting a serious disease.

29.    Further, although technologies to control EtO have been available and widely used since the 1980s, Steri-Tech operated for years in Puerto Rico without using the best practices and control technologies available to reduce their emissions.

30.     As sophisticated corporations and long-term users, transporters, and emitters of EtO, Defendants had superior knowledge and access to information regarding the dangers of EtO, more so than the general public or Ms. Garcia Rivera.

31.     While the harmful properties of EtO are not widely known to the average person who is not involved in the business of EtO sterilization, the harmful properties of EtO have been known—or should have been known—to Defendants and anyone in the business of manufacturing, distributing, using and emitting EtO as part of a sterilization process, for decades. By way of example:

a.  In a 1977 article, the National Institute of Occupational Safety and Health ("NIOSH") concluded that occupational exposure to EtO may increase the frequency of genetic mutations in humans. The NIOSH report also raised concerns about the potential carcinogenicity of EtO.

b.  In 1981, NIOSH released a subsequent report which recommended that EtO be regarded in the workplace as a potential occupational carcinogen. NIOSH based its recommendation on new evidence of EtO's carcinogenic, mutagenic, and reproductive hazards, including studies demonstrating that EtO induced cancer in experimental animals. Specifically, the studies showed an increase in instances of leukemia in line with increases of EtO concentrations, in addition to other adverse effects on reproductive health. An epidemiological investigation of Swedish workers exposed to EtO also revealed increased incidences of leukemia and other cancers.

c.  In 1985, the U.S. Department of Health and Human Services published the Fourth Annual Report on Carcinogens and classified EtO as reasonably anticipated to be a human carcinogen.

d.  In the early 1990s, NIOSH published the largest and most informative epidemiological study of EtO. The study analyzed over 18,000 employees working with EtO at fourteen different industrial facilities sterilizing medical equipment and food spices. The study found sufficient evidence to support a causal link between exposure to EtO and increased mortality from lymphatic and hematopoietic cancers. Follow-up studies have additionally demonstrated an association between EtO exposure and breast cancer.

e.  In 1994, as a result of these findings, the World Health Organization ("WHO") listed EtO as a Group 1 human carcinogen—the agency's highest risk classification—finding EtO to be carcinogenic to humans.

f.  In 2000, following suit, the U.S. Department of Health and Human Services reclassified EtO to "known to be a human carcinogen."

g.  The U.S. Department of Labor's Occupational Safety and Health Administration's (hereinafter "OSHA") 2002 fact sheet on EtO indicates that "[b]oth human and animal studies show that EtO is a carcinogen" and requires employers to provide clear signs and labels notifying workers of EtO's "carcinogenic and reproductive hazards."[4]

h.  In 2016, the EPA's Integrated Risk Information System similarly reclassified EtO as carcinogenic to humans and increased—by a multiple of 30 in adults and 60 in children—its estimate of EtO's cancer potency.[5]

## II.  Defendants Exposed Ms. Garcia Rivera to Dangerous Levels of EtO

32.  Despite knowing these risks, Defendants' EtO sterilization process did not comply with safe and prudent methods of EtO sterilization.

33.  At all relevant times, Steri-Tech—by way of failure to implement control measures to limit emissions, failure to upgrade sterilization equipment, intentional shortening of EtO degassing/aeration/quarantining time, and/or other unsafe practices—subjected Ms. Garcia Rivera to unhealthy and dangerous levels of EtO in order to increase profits and/or cut costs.

34.  At all relevant times, Defendants failed to train employees and managers, resulting in unsafe practices which created risky EtO sterilization practices with the goal of saving money.

35.  Defendants had knowledge of faulty/ineffective training systems, faulty/ineffective supervision, and employees' inabilities to perform their jobs safely.

36.  On August 22, 2018, the U.S. EPA released the 2014 National Air Toxic Assessment ("NATA")—a screening tool that estimates cancer risks based on emission data in 76,727 census tracts across the United States. The 2014 NATA revealed 109 census tracts in the United States with cancer-risk scores greater than 100 cases per one million people exposed to toxic air pollution during their lifetime, more than what the U.S. EPA considers "acceptable" limits.

---

[4] See, Occupational Safety and Health Administration (OSHA), *OSHA Fact Sheet: Ethylene Oxide*, https://www.osha.gov/OshDoc/data_General_Facts/ethylene-oxide-factsheet.pdf, (last accessed: February 9, 2024).

[5] Max Blau and Lylla Younes, *The Dirty Secret of America's Clean Dishes*, ProPublica (Dec. 20, 2021) https://www.propublica.org/article/the-dirty-secret-of-americas-clean-dishes, (last accessed: February 9, 2024).

37.     Exposure to EtO has been widely studied, and its negative health effects are well documented. Presently, there is evidence linking exposure to increased risk of lymphohematopoietic cancer such as non-Hodgkin's lymphoma, multiple myeloma, and lymphocytic leukemia; breast cancer; tumors in the lungs, uterus, and the brain; and reproductive and developmental impairments including increased rate of miscarriages and infertility.

38.     Commercial medical equipment sterilizers use the EtO sterilization process on over 20 billion healthcare products annually in the United States. The EtO sterilization process begins by placing medical equipment in a gas chamber. After air is pumped out of the chamber, EtO is injected and allowed to diffuse into the products for several hours. Once the medical equipment is sterilized, the EtO is pumped out of the chamber and the remaining EtO is allowed to slowly dissipate. Each time this sterilization cycle is run, EtO is emitted—whether through controlled or uncontrolled emissions known as "fugitive emissions"—into the air and inhaled by the surrounding community.

39.     The EPA's required tracked emission figures do not accurately account for these fugitive emissions, which include untracked ventilation due to lack of maintenance, faulty design, and other untracked escape pathways for this highly explosive air toxin.

40.     EtO is extremely flammable and explosive in its room-temperature gaseous form— therefore, it is typically handled and shipped as a refrigerated liquid to mitigate those risks.

41.     In fact, EtO is so explosive that it is one of the main components in thermobaric and "fuel-air explosive" weapons used by the US military, sometimes referred to as "vacuum bombs." These bombs often produce an atomic-mushroom-like smoke signature and blast characteristics that look like "mini-nukes." They are among the most powerful nonnuclear weapons in our country's arsenal. EtO is a preferred compound for such military uses because it

has a shock wave effectiveness of 5:1 compared to dynamite—in other words, to duplicate the shock wave of 5 pounds of dynamite, you need just 1 pound of EtO.[6]

42.    In addition to EtO's explosive quality, it is also odorless—unless one is to inhale very concentrated amounts, which is effectively only possible in occupational exposure scenarios. Other industries that handle chemicals with these characteristics—such as the liquified petroleum gas industry—combine an additive with their products to alert users and other nearby individuals of leaks. Such measures have proven to be effective in alerting propane users to a problem - and giving them the time they need to ensure their safety. Defendants have instituted no such readily available safety precautions with EtO.

43.    In manufacturing, distributing, and using EtO, Defendants have neglected to add any odorous substances to EtO to alert employees and residents in the neighborhoods of the Sterilization Facilities that EtO is endangering them.

44.    Balchem Corp. is a global leader in the production and sale of performance gases, including EtO. EtO from Balchem Corp. is distributed in cylinders and drums globally as per the Balchem Corp. website. Page 5 of the August 24, 2022, data sheet available on the website (only in English) presents the following warning:

> Statement of Hazards: DANGER! Extremely flammable liquid and gas under pressure. May form explosive mixtures with air. Highly Reactive. Harmful or fatal if inhaled and may cause delayed lung injury, respiratory system and nervous system damage. Inhalation may cause dizziness or drowsiness. Liquid contact may cause frostbite. May cause allergic skin reaction. Harmful if swallowed. May cause adverse blood effects, liver and kidney damage based on animal data. Cancer and reproductive hazard.
> HAZARD RATINGS: (0 = minimum; 4 = maximum) HMIS Rating:
> Health = 3
> Flammability = 4
> Reactivity = 3

---

[6] Meyer R, Köhler, J., Homberg A. *Explosives. 6th ed*. Weinheim, Germany: Pg. 142.

45.     Furthermore, the fact that this data sheet is only available in English is concerning because Ms. Garcia Rivera and her community predominantly speak Spanish.[7]

46.     According to the EPA, Balchem is the only EtO "technical registrant".[8] A technical registrant is a company or individual that owns the source of the active ingredient in a pesticide product and has registered it with the EPA.[9]

47.     A technical registrant is responsible for providing the data and information to support the safety and efficacy of the active ingredient, as well as complying with the EPA's regulations and requirements. A technical registrant typically has a significantly greater investment, as well as greater responsibilities and liabilities, than an end-use product registrant.

48.     Further, Balchem Corp. provides training to Steri-Tech, which has operated a facility at RD. 701 KM 0.7, Salinas, Puerto Rico since 1986.

49.     On July 11, 2023, the Occupational Safety and Health Administration (OSHA) announced it issued a $393,798 fine to Balchem Corp. subsidiary, BCP Ingredients, Inc. after agency inspectors found dozens of serious safety and health violations at the company's chemical plant.[10]

---

[7]     Balchem Corporation, *Safety Data Sheet,* www.balchem.com/performance-gases/wp-content/uploads/sites/5/2021/02/SDS_ARC_Ethylene-Oxide-1.pdf, (last accessed: February 9, 2024).

[8] United States Environmental Protection Agency (EPA), *Ethylene Oxide Proposed Interim Registration Review Decision Case Number 2275*, (March, 2023) https://www.epa.gov/system/files/documents/2023-04/eto-pid.pdf, (last accessed: February 9, 2024).

[9] United States Environmental Protection Agency (EPA), *How to Register a Pesticide – A Guide for Applicants New to the Process*, https://www.epa.gov/pesticide-registration/how-register-pesticide-guide-applicants-new-process, (last accessed: February 9, 2024).

[10] Guy Burdick, *OSHA Issues A Pair of Six-Figure Fines*, EHS DAILY ADVISOR (July 13, 2023), https://ehsdailyadvisor.blr.com/2023/07/osha-issues-a-pair-of-six-figure-fines/ (last accessed: February 9, 2024).

50.    In October of 2021, OSHA cited the same facility for 24 serious safety and health violations, including inadequate medical evaluation procedures for workers exposed to ethylene oxide.[11]

51.    Balchem's wholly owned subsidiary BCP Ingredients, Inc. was cited for safety violations which included:

a.    Inadequate process safety management procedures and monitoring;

b.    Failing to develop an emergency evacuation plan;

c.    Failing to train workers on actions to take in the event of a chemical release;

d.    Exposing respirators to ethylene oxide while in storage; and

e.    Allowing electrical safety hazards.[12]

52.    "Ethylene oxide is a colorless and flammable gas and unsafe exposure can cause cancer and other serious health issues," Karena Lorek, OSHA's Kansas City, Missouri, area director, said in an agency statement. "The company's failure to address its previous violations and follow OSHA regulations is troubling. BCP needs to bring its monitoring procedures into compliance immediately and re-evaluate its engineering processes to make sure its employees are kept safe and healthy."

53.    Balchem Corp. supplies EtO to its Puerto Rico distributor, Mays, which distributes EtO to the Steri-Tech facility[13] and is the facilitator of Balchem's products and safety procedures in Puerto Rico.[14]

---

[11] U.S. Department of Labor, Occupational Safety and Health Administration, *Citation and Notification of Penalty,* (October 1, 2021), www.dol.gov/sites/dolgov/files/OPA/newsreleases/2021/10/OSHA%2020211760A.pdf (last accessed: February 9, 2024). (last accessed: February 9, 2024).

[12] *Id.*

[13] See **Exhibit 1**, Bill of Lading, by Mays from Balchem to Steri-Tech.

[14] *See* **Exhibit 2**, Declaration of Emely Hernandez, ¶¶ 23-27. The full Declaration is incorporated herein by reference, in the interest of judicial economy.

54. Unfortunately, these "safety" procedures are woefully insufficient or ineffective. For instance, while Balchem provided dedicated training to Steri-Tech employees every two years on practices for handling EtO, employees who were hired in between the two-year gap of Balchem's training were only provided with printed copies of the presentations used by Balchem training personnel with no additional guidance or explanation before starting work.[15]

55. Through their industrial processes and the lack of training from Balchem and Mays, and lack of enforcement, these plants emit EtO into the air, poisoning the air in communities surrounding the facilities.

56. Despite these facts, Defendants continued to use EtO in their sterilization processes and failed to implement adequate safety measures to limit emissions or notify local residents, including Ms. Garcia Rivera, of the health risks.

### III. Defendant Steri-Tech Violated the Clean Air Act ("CAA")

57. Steri-Tech's facility emits EtO through several key mechanisms, including:

   a. Smokestack Emissions: After the sterilization process, treated exhaust from the sterilization chambers is released into the atmosphere through the facility's smokestack. This emission is supposed to be controlled by a thermal oxidizer, which is designed to break down EtO before it reaches the environment.

   b. Fugitive Emissions: EtO can escape through unmonitored and unreported pathways, such as leaks from storage tanks, handling equipment, and ventilation systems. These fugitive emissions often go unaccounted for, increasing the overall EtO release from the facility.

   c. Ventilation System Emissions: During the sterilization and aeration phases, residual EtO is vented from chambers and released into the air, further contributing to harmful emissions.

---

[15] *Id.* at ¶ 27.

58.     Despite being subject to strict regulations under the National Emission Standards for Hazardous Air Pollutants (NESHAP) for Sterilization Facilities (40 C.F.R. Part 63, Subpart O), Steri-Tech has consistently violated CAA standards.[16]

59.     First, Steri-Tech failed to maintain required oxidation temperatures. Steri-Tech's thermal oxidizer, which is required to operate at a minimum temperature of 1,521°F to achieve 99% destruction of EtO, has consistently operated below this threshold. EPA inspections recorded temperatures between 700°F and 900°F, allowing excessive amounts of EtO to escape into the atmosphere. This failure violates 40 C.F.R. § 63.362(c), 63.363(a)(1), and 63.363(b)(3), and Section 112 of the CAA and exposed Ms. Garcia Rivera and the community to dangerous levels of EtO.

60.     Second, Steri-Tech failed to comply with continuous monitoring and reporting requirements: Steri-Tech is required to continuously monitor and report the temperatures of its thermal oxidizer to ensure compliance with CAA standards. However, the facility failed to install necessary monitoring equipment and did not keep accurate records, violating 40 C.F.R. §§ 63.363(f), 63.364(c), and Section 112 of the CAA. As a result, actual EtO emissions were underreported, putting Ms. Garcia Rivera and nearby communities at risk.

61.     Third, Steri-Tech failed to demonstrate compliance with Catalytic Recuperative Oxidizer (CRO) standards: Steri-Tech installed a CRO in 2022, but has faced multiple operational failures, including explosions when EtO concentrations exceeded safety limits. The facility failed to demonstrate that the CRO can achieve the required 99.9% destruction efficiency for EtO, in violation of both its operating permit and NESHAP regulations.

---

[16] In the matter of Steri-Tech, Inc Compliance Administrative Order, Docket No. CAA-02-2024-1001.

62.     These violations demonstrate a clear pattern of noncompliance with the CAA, posing a significant public health risk to Ms. Garcia Rivera and the surrounding communities.

63.     Pursuant to Section 304 of the CAA, 42 U.S.C. § 7604, on October 29, 2024, Plaintiffs provided a formal Notice of Intent to Sue to Steri-Tech and the relevant state and federal agency heads regarding Steri-Tech's operations in Salinas, Puerto Rico. As of December 28, 2024, sixty (60) days passed since the notice was served. Neither the EPA nor the Puerto Rico Department of Natural and Environmental Resources is diligently prosecuting the violations described in the notice. Accordingly, Ms. Garcia Rivera now brings this action to address the ongoing violations and seeks appropriate relief under the law.

**IV.     Defendants' Knew and Failed to Sufficiently Address the Deadly Emissions.**

64.     At all relevant times, Defendants knew or should have known that EtO is a dangerous, toxic, carcinogenic, and poses a serious threat to human health. The risks associated with EtO have been well-known in the scientific and regulatory communities since the 1980s.

65.     Despite this knowledge, Steri-Tech failed to use available technologies to control emissions, failed to warn Ms. Garcia Rivera and other residents of the risks, and continued to emit EtO into the air in quantities far exceeding safe limits.

66.     Defendants' actions and omissions were reckless, demonstrating a callous disregard for public safety. Their conduct constitutes gross negligence, and they are liable for the injuries and damages suffered by Ms. Garcia Rivera.

**V.     Ms. Garcia Rivera's Exposure and Injury**

67.     Ms. Garcia Rivera resided within 1000 feet of the Steri-Tech facility from 1986 to 2012, and within one mile from Steri-Tech since 2012, regularly breathing in air contaminated with EtO.

68.     At all relevant times, toxic EtO fumes were emitted by Steri-Tech's facility, contaminating the air in surrounding communities, including Salinas, Puerto Rico. Ms. Garcia Rivera, unknowingly and without her consent, was exposed to this carcinogenic compound for decades.

69.     As such, Ms. Garcia Rivera has unknowingly been exposed to this dangerous chemical for almost 40 years and continues to be exposed to this day. Such exposure amounts to offensive contact which is an afront to her reasonable sense of personal dignity.

70.     In 2019, Ms. Garcia Rivera was diagnosed with breast cancer, a disease that is scientifically linked to EtO exposure. Her cancer diagnosis is consistent with the types of cancers caused by prolonged exposure to EtO.

71.     Ms. Garcia Rivera's exposure is continuing and ongoing which has exacerbated her injuries.

72.     Ms. Garcia Rivera has suffered significant physical and emotional pain as a result of her breast cancer diagnosis. She has undergone surgery, chemotherapy, and radiation, and continues to face ongoing health risks and medical expenses.

73.     The exposure to EtO from Steri-Tech's facility has placed Ms. Garcia Rivera at a heightened risk of developing additional health problems, and she requires continued medical monitoring and treatment.

## VI.    Environmental Justice Concerns Related to the Steri-Tech Facility

74.     The Steri-Tech facility is in Salinas, Puerto Rico, an area with significant environmental justice ("EJ") concerns as identified by the EPA's enforcement and compliance

database.[17] The communities surrounding the facility, including Ms. Garcia Rivera's neighborhood, are disproportionately impacted by environmental hazards.

75.    The EJScreen Community Report, an environmental justice database, shows that percentiles for both the census block group where the facility is located and the 1-mile radius surrounding it are in the ≥ 90th percentile, indicating that the area is among the top 10% of locations in the United States with the greatest risk of suffering from the effects of environmental pollution.[18] This highlights that the Steri-Tech facility's emissions are likely to disproportionately affect these vulnerable communities, including residents such as Ms. Garcia Rivera.

76.    The report indicates that the communities surrounding the Steri-Tech facility are composed largely of low-income and minority populations, who often have less access to healthcare, resources, and political influence to address or mitigate environmental harm. As a result, these populations, including Ms. Garcia Rivera, are more vulnerable to the carcinogenic effects of the ethylene oxide (EtO) emitted by the facility.

77.    The close proximity of the Steri-Tech facility to residential areas and schools exacerbates the impact of the facility's emissions on the local population. Residents, including Ms. Garcia Rivera, have been exposed to elevated levels of EtO, a known carcinogen, for decades without the residents' consent, without sufficient warning and without protective measures from the Defendants.

78.    The long-term exposure to EtO in these communities increases the risk of cancer, respiratory issues, and other serious health problems. These disproportionate impacts are well-

---

[17] https://echo.epa.gov/detailed-facility-report?fid=110000602820#community.

[18] https://ejscreen.epa.gov/mapper/mobile/EJSCREEN_mobile.aspx?geometry={%22x%22:-66.300278,%22y%22:17.97139,%22spatialReference%22:{%22wkid%22:4326}}&unit=9035&areatype=&areaid=&basemap=hybrid&distance=1.

documented in the EJ analysis and further demonstrate the recklessness of the Defendants in failing to mitigate the risks posed to Ms. Garcia Rivera and her community.

79.    Ms. Garcia Rivera, has resided in the neighborhood around Steri-Tech since 1978. In 1986, Steri-Tech started operations less than 1000 feet from her residence continuously exposing her to EtO. Due to the combination of high EJ index scores and the proximity of the facility to vulnerable populations, Ms. Garcia Rivera is part of a community that has been disproportionately affected by the Steri-Tech facility's hazardous emissions in violation of the CAA. This exacerbates the injuries and health risks she faces as a result of her ongoing exposure to EtO.

80.    Considering the health risks and EJ concerns associated with EtO, the FDA has actively promoted and approved several alternative sterilization methods. These alternatives reduce reliance on EtO and provide effective and safe sterilization options for medical devices.

81.    Such market alternatives include the following:

| 1. Hydrogen Peroxide Gas Plasma | Hydrogen peroxide gas plasma[19] is a leading alternative to EtO, utilizing reactive vapor to sterilize medical devices. This method is effective for heat and moisture-sensitive items and offers a rapid sterilization process compared to EtO. The FDA has endorsed this method due to its efficiency and safety profile, making it a suitable choice for many medical applications currently being filled by EtO. |
|---|---|
| 2. Gamma Radiation | Gamma radiation[20] is a well-established sterilization technique that uses high-energy photons to destroy microorganisms. This method is particularly effective for single-use medical products, ensuring sterility without the need for high temperatures or moisture. The FDA recognizes gamma radiation as an environmentally safe, reliable, and effective alternative to EtO, suitable for a wide range of medical devices. |

---

[19] U.S. Food and Drug Administration, *Coronavirus (COVID-19) Update: FDA Issues Emergency Use Authorization to Decontaminate Millions of N95 Respirators*, FDA, (Apr. 12, 2020) https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-issues-emergency-use-authorization-decontaminate-millions-n95.

[20] U.S. Food and Drug Administration, *Food Irradiation: What You Need to Know*, FDA, https://www.fda.gov/food/buy-store-serve-safe-food/food-irradiation-what-you-need-know (last updated Mar. 5, 2024).

| 3. | Electron Beam (E-Beam) Radiation | Electron beam (E-beam) radiation[21] is another effective sterilization method, utilizing high-energy electrons to sterilize medical equipment. E-beam radiation is precise, efficient, and does not leave any residual chemicals, making it a clean and environmentally friendly option. The FDA's support for E-beam sterilization underscores its commitment to promoting safe and effective alternatives to EtO. |
|---|---|---|
| 4. | Steam Sterilization (Autoclaving) | Steam sterilization[22], or autoclaving, remains a widely used and reliable method for sterilizing heat-resistant medical instruments. This process involves exposing devices to high-pressure saturated steam, effectively killing all microbial life forms. The FDA continues to endorse steam sterilization for its proven efficacy and safety, particularly for the many durable items that can withstand high temperatures. |
| 5. | Vaporized Hydrogen Peroxide (VHP) | Vaporized hydrogen peroxide (VHP)[23] is another alternative method that uses hydrogen peroxide in its vapor form to achieve sterilization. VHP is effective at low temperatures, making it suitable for heat-sensitive medical devices. The FDA has approved VHP as a reliable alternative to EtO, supporting its use in various sterilization applications due to its efficiency and lack of toxic residues. |
| 6. | Peracetic Acid | Peracetic acid[24] is an oxidizing agent used in low-temperature sterilization processes, suitable for heat-sensitive devices. It involves immersing devices in a peracetic acid solution, rapidly killing microorganisms without leaving harmful residues. The FDA's approval of peracetic acid as a sterilization method highlights its commitment to promoting safe and effective alternatives to EtO. |
| 7. | Dry Heat Sterilization | Dry heat sterilization[25] uses high temperatures to sterilize medical devices, particularly those that can withstand prolonged exposure to heat. This method is effective at killing all forms of microbial life and does not involve the use of chemicals. The FDA supports dry heat sterilization for its safety and efficacy, particularly for certain types of medical devices like powders, oils, and metal instruments. |

---

[21] *Id.*

[22] U.S. Food and Drug Administration, *Sterilization for Medical Devices*, FDA, https://www.fda.gov/medical-devices/general-hospital-devices-and-supplies/sterilization-medical-devices (last updated May. 29, 2024).

[23] U.S. Food and Drug Administration, *FDA Facilitates Broader Adoption of Vaporized Hydrogen Peroxide for Medical Device Sterilization*, FDA, https://www.fda.gov/news-events/press-announcements/fda-facilitates-broader-adoption-vaporized-hydrogen-peroxide-medical-device-sterilization (last updated Jan. 8, 2024).

[24] U.S. Food and Drug Administration, *FDA-Cleared Sterilants and High Level Disinfectants with General Claims for Processing Reusable Medical and Dental Devices*, FDA, https://www.fda.gov/medical-devices/reprocessing-reusable-medical-devices-information-manufacturers/fda-cleared-sterilants-and-high-level-disinfectants-general-claims-processing-reusable-medical-and (last updated Nov. 30, 2023).

[25] U.S. Food and Drug Administration, *Sterilization for Medical Devices*, FDA, https://www.fda.gov/medical-devices/general-hospital-devices-and-supplies/sterilization-medical-devices (last updated May. 29, 2024).

| 8. Supercritical Carbon Dioxide (SCCO2) | Supercritical carbon dioxide (SCCO2)[26] sterilization is an emerging technology that uses carbon dioxide in its supercritical state to sterilize medical devices. SCCO2 can penetrate complex device geometries without leaving toxic residues, making it suitable for delicate and heat-sensitive devices. The FDA recognizes the potential of SCCO2 sterilization and supports its development as an additional safe and effective alternative to EtO |
| --- | --- |

82.    Despite the availability of these alternatives, Defendants used EtO in a dense residential area, to the detriment of Ms. Garcia Rivera.

## CAUSES OF ACTION

### COUNT I
### Violation of the Clean Air Act 42 U.S.C. § 7604
### Against Defendant Steri-Tech, Inc.

83.    Plaintiff incorporates allegations in paragraphs 1-82 as if fully set forth herein.

84.    The Clean Air Act ("CAA") provides for a private right of action under 42 U.S.C. § 7604, giving Plaintiff standing to bring this claim.

85.    Defendant Steri-Tech, Inc. operates a commercial sterilization facility that emits EtO, a hazardous air pollutant regulated under the CAA, 42 U.S.C. § 7401 et seq., and subject to the National Emission Standards for Hazardous Air Pollutants (NESHAP) for Sterilization Facilities under 40 C.F.R. Part 63, Subpart O.

86.    The CAA and the regulations promulgated thereunder require Steri-Tech to limit and control EtO emissions from its facility to protect public health and the environment.

---

[26] U.S. Food and Drug Administration, *CDRH Announces Radiation Sterilization Master File Pilot Program*, https://www.fda.gov/medical-devices/medical-devices-news-and-events/cdrh-announces-radiation-sterilization-master-file-pilot-program (last updated Apr. 11, 2023).

87.    Defendant Steri-Tech has violated, and continues to violate, the CAA by failing to comply with the following regulatory requirements:

    a.    Failing to maintain the required minimum operating temperatures of 1,521°F for its thermal oxidizer to ensure a 99% destruction efficiency of EtO, as required by 40 C.F.R. § 63.362(c), 63.363(a)(1), and 63.363(b)(3), and Section 112 of the CAA. EPA inspections revealed oxidizer temperatures consistently below the required threshold, allowing excessive EtO emissions.

    b.    Failing to comply with continuous monitoring and reporting requirements for the thermal oxidizer as mandated by 40 C.F.R. §§ 63.363(f), 63.364(c), and Section 112 of the CAA. Defendant did not install or maintain appropriate monitoring equipment, resulting in inaccurate reporting of EtO emissions and failure to demonstrate ongoing compliance with emission standards.

    c.    Failing to ensure that the newly installed Catalytic Recuperative Oxidizer (CRO) meets the 99.9% EtO destruction efficiency standard, in violation of both NESHAP requirements and the facility's operating permit. The CRO has experienced multiple operational failures, including explosions caused by exceeding EtO concentration limits.

88.    As a result of Defendant's ongoing violations of the CAA, Steri-Tech has released significant amounts of EtO into the atmosphere, contributing to elevated cancer risks, environmental degradation, and public health hazards for the surrounding communities.

**89.**    The violations identified herein constitute a "failure to comply with an emission standard or limitation" as defined in 42 U.S.C. § 7604(f) and give rise to a citizen suit under 42 U.S.C. § 7604(a), allowing for the imposition of civil penalties and injunctive relief.

### COUNT II
### Negligence
### Against Each Defendant Individually and Collectively

90.    Plaintiff incorporates allegations in paragraphs 1-82 as if fully set forth herein.

91.    Defendants knew or should have known harmful levels of EtO were escaping the Steri-Tech facility and contaminating the community, including Plaintiff's property.

92.    At all relevant times, Defendants owed a duty of care to Plaintiff on the safe handling of the EtO, education, training and supervision of the persons handling the product and

the operation of the Steri-Tech facility in a manner that would not expose her to unreasonably harmful levels of EtO.

93.     Despite the fact Defendants knew or should have known that EtO is a carcinogenic vapor, Defendants breached their duty in the following ways:

      a.   Emitting dangerous volumes of EtO into the air from the Steri-Tech facility;

      b.   Disregarding safe methods to adequately control EtO emissions from the facility;

      c.   Failing to warn or advise Ms. Garcia Rivera who lives and works in the area that she was being exposed to EtO;

      d.   Failing to adequately record test results of high levels of EtO;

      e.   Ignoring test results of high levels of EtO;

      f.   Underreporting EtO levels; and

      g.   Subjecting Ms. Garcia Rivera, who lives within one mile of the facility, to elevated cancer risks.

94.     As a direct and proximate result of Defendants' negligence, Plaintiff breathed in air contaminated with elevated levels of EtO—amounts that are far higher and more hazardous than acceptable standards, including those set by the U.S. EPA.

95.     This exposure to a toxic carcinogen led to Ms. Garcia Rivera's breast cancer diagnosis and other significant health complications.

96.     Plaintiff has suffered physical injury, emotional distress, medical expenses, and will continue to require ongoing medical monitoring and treatment due to her significant exposure to EtO.

## COUNT III
### Strict Liability – Ultrahazardous Activity
### Against Each Defendant Individually and Collectively

97.    Plaintiff incorporates allegations in paragraphs 1-82 as if fully set forth herein.

98.    EtO is abnormally dangerous because of the highly toxic and volatile nature of the substance, the existence of a high degree of risk of some harm to others the EtO poses, the likelihood that the harm that results from it will be great, the inability to utilize the substance as Defendants have without producing unsafe levels of emissions, the location of the plant in a densely populated area, and the comparative lack of economic value the facility to the community.

99.    The use and emission of EtO from this facility constitutes a highly hazardous or ultrahazardous activity.

100.    These EtO emissions created a high degree of risk to those who live, go to school, pray, and work in the surrounding area. Further, the likelihood of cancer caused by the Defendants' use and emission of EtO in 2022 alone is as much as 600 times the maximum acceptable risk level based on recent EPA testing—and likely many times that maximum acceptable risk level during, at least, the late 1970s-early 1990s.

101.    Defendants' use and emission of EtO is especially inappropriate given the area in which it is located, within a densely populated residential area and among schools, municipal buildings, churches, and parks.

102.    While the activities conducted by Defendants are exceedingly dangerous, they offer comparatively little value to the surrounding community.

103.    Because the alleged EtO related activities of Defendants are ultrahazardous, they are strictly liable for any injuries proximately resulting therefrom.

104.    As a direct and proximate result of Defendants' ultrahazardous activities, Plaintiff has been exposed to and inhaled great amounts of EtO while living in the impacted community.

105.    As a direct and proximate result of Plaintiff's inhalation of EtO emissions from the facility, they developed the herein alleged injuries, which have caused and will continue to cause Plaintiff to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, and a loss of their normal life.

106.    Plaintiffs respectfully request that judgment be entered in their favor and against Defendants in an amount to be determined by the jury at trial.

**COUNT IV**
**Strict Liability- Failure to Warn or Instruct**
**Article 1802 of the Puerto Rico Civil Code (31 L.P.R.A. § 5141)**
**Against each Defendant Individually and Collectively**

107.    Plaintiff incorporates allegations in paragraphs 1-82 as if fully set forth herein.

108.    The handling and emission of EtO constitutes an ultrahazardous activity. Defendants are strictly liable for any harm caused by their emission of EtO, regardless of fault or negligence.

109.    Defendants' sterilant products were not reasonably safe at the time they left their control because they lacked adequate warnings and/or instructions concerning the dangers and hazards associated with EtO.

110.    At all relevant times the Defendants manufactured, distributed, marketed, sold, stored, and used sterilant products, they knew or should have known their EtO products were dangerous and threatened and still threaten the community and property where Plaintiff has been living.

111.    Despite the Defendants' knowledge, they failed to provide adequate warnings and/or instructions to Plaintiff or her community that Defendants' EtO and EtO-containing products were toxic, carcinogenic, and would injure Plaintiff's health and livelihood.

112.    The EtO reached the Plaintiff's property and community without any substantial change in condition from when they left the control of the Defendants.

113.    The absence of warnings presented to Plaintiff regarding these EtO-products made the products inherently dangerous.

114.    Defendants had a duty to warn Plaintiff due to the hazardous nature of EtO that was not commonly known to the community surrounding Steri-Tech.

115.    Defendants could have warned of and instructed about these dangers but failed to do so and intentionally concealed information in order to maximize profits for decades.

116.    Defendants continued to conceal the dangers of ETO after they manufactured, distributed, marketed, sold, stored, and used ETO and ETO-containing products.

117.    Defendants are strictly liable for all damages to Plaintiff arising out of their failure to provide adequate warnings and instructions regarding their unreasonably dangerous nature of EtO.

118.    The Defendants' manufacture, distribution and negligent use of EtO resulted in the injurious exposure to EtO for Plaintiff, causing her breast cancer and creating other ongoing threats to her physical and economic health and well-being.

119.    Plaintiff has suffered, is suffering, and will continue to suffer into the indeterminable future as a result of Defendants' manufacture, distribution and negligent use of EtO and the resulting presence of EtO in the air she breathes and within her body.

120.     The Defendants are strictly liable for all damages arising out of their failure to warn plaintiff of the ultrahazardous nature of EtO.

121.     Plaintiff's injuries, including her breast cancer diagnosis, were caused by her prolonged exposure to EtO emitted from Steri-Tech's facility, distributed and transported by Mays and manufactured by Balchem, for which Defendants are strictly liable.

## COUNT V
### Strict Liability – Design Defect
### Article 1802 of the Puerto Rico Civil Code (31 L.P.R.A. § 5141)
### Against Each Defendant Individually and Collectively

122.     Plaintiff incorporates allegations in paragraphs 1-82 as if fully set forth herein.

123.     The handling and emission of sterilant products constitute an ultrahazardous activity. Defendants are strictly liable for any harm caused by their emission of EtO, regardless of fault or negligence.

124.     Defendants' manufacture, distribution, storing, handling and use of the sterilant product as described herein constituted an unreasonably and inherently dangerous design of such products in that they contained EtO, a known toxic substance and carcinogen, at the time they left their control.

125.     Defendants' sterilant products' toxicity, ability to bioaccumulate, inability to be contained, and environmental persistence rendered it defective and unreasonably dangerous at all times.

126.     Defendants' sterilant products were unsafe as designed and failed to perform safely in a manner that resulted in the injuries of Plaintiff.

127.     The risks and danger inherent in the design of the Defendants' sterilant products drastically outweighed any perceived benefits of the design of such products when such products were put to reasonably foreseeable uses.

128. Defendants knew their sterilant products were unsafe to an extent beyond that which would be contemplated by an ordinary person.

129. Additionally, any benefit to the sterilant product design fails to outweigh the danger of the inherent risk. Practical and feasible alternative designs for sterilant products capable of reducing Plaintiff's injuries, damages, and financial losses were commercially available, including mineral oils, silicone fluids, vegetable oils, and nonfluid insulating chemicals, as well as alternative chemical formulations and/or additional chemical processing measures.

130. Another feasible and practical design alternative Defendants could have chosen was a basic precautionary measure of adding an odor to the sterilant products that would alert residents in the vicinity of the toxic EtO emissions present in the air they were breathing.

131. The EtO reached Plaintiff's property and community without their knowledge and without any substantial change in condition from when they left the control of the Defendants.

132. The Defendants' unreasonably dangerous sterilant products caused the permanent presence of EtO in the bodies of Plaintiff, including threats and damages to the physical well-being of the Plaintiff as well as economic damages in the form of medical expenses, lost wages and diminished property values.

133. Plaintiff has suffered, is suffering, and will continue to suffer into the indeterminable future as a result of Defendants' unreasonably dangerous sterilant products and the presence of EtO within the body of Plaintiff.

134. Defendants are strictly liable for all damages arising out of their defectively designed sterilant products.

135.    Plaintiff's injuries, including her breast cancer diagnosis, were caused by her prolonged exposure to EtO emitted from Steri-Tech's facility, distributed and transported by Mays and manufactured by Balchem for which Defendants are strictly liable.

**COUNT VI**
**Negligent Design Defect**
**Article 1802 of the Puerto Rico Civil Code (31 L.P.R.A. § 5141)**
**Against Each Defendant Individually and Collectively**

136.    Plaintiff incorporates allegations in paragraphs 1-82 as if fully set forth herein.

137.    Defendants owed a duty of reasonable care to protect Plaintiff against the unreasonable health and safety risks resulting from the production, use, and disposal of EtO and EtO-containing products at their respective plants.

138.    The Defendants failed to exercise ordinary care because a reasonably careful company—that knew of EtO's toxicity, carcinogenicity, danger to humans, and destruction of the lands—would not manufacture, distribute, use, and dispose of those products; would warn of their toxic and environmentally hazardous properties; or would take steps to enhance the safety and/or reduce the toxicity and environmental persistence of the products.

139.    Defendants failed to exercise ordinary care because reasonably careful companies that knew that EtO could not be contained during normal production, distribution, use, and disposal efforts would not continue to manufacture, distribute, use, and attempt to dispose of EtO in a way that allowed the discharge of EtO into and onto Plaintiff's property and community.

140.    Defendants failed to exercise ordinary care because reasonably careful companies would not continue to manufacture, distribute, store, use, and dispose of EtO in mass quantities and to the extent and in the applications that Defendants manufactured and attempted to dispose of them.

141.    Defendants failed to exercise ordinary care because reasonably careful companies would use basic precautionary measures of adding an odor to EtO that would alert residents in the vicinity of the toxic EtO emissions present in the air they were breathing.

142.    Defendants' EtO and EtO-containing products in Plaintiff caused and continue to cause injury and damage to the health and well-being of Plaintiff.

143.    Plaintiff has suffered, are suffering, and will continue to suffer into the indeterminable future injuries as a result of Defendants' negligent design defect.

<u>**COUNT VII**</u>
<u>**Battery**</u>
<u>**Against Each Defendant Individually and Collectively**</u>

144.    Plaintiff incorporates allegations in paragraphs 1-82 as if fully set forth herein.

145.    At all relevant times the Defendants intentionally manufactured, distributed, marketed, sold EtO and EtO-containing products, knowing that their products were not safe and were likely to cause toxic EtO contamination to the community and property where Plaintiff has been living and working.

146.    At all times relevant, Defendants knew with substantial certainty that they were emitting harmful levels of EtO that contaminated Plaintiff's property, place of employment, and community, which resulted in harmful and offensive contact.

147.    Defendants' recklessly caused Plaintiff's property and community to come in contact with this contaminant in such a way that was offensive and harmful, a substance that a reasonable person would find objectionable to personal health and safety, an affront to one's self-respect as a human being, and a violation of one's reasonable sense of personal dignity.

148.    Defendants are substantially certain that continuing to manufacture, market, distribute, sell, store, use, and dispose of EtO will cause Plaintiff to continue to be exposed to harmful levels of EtO in her home, work, and community.

149.    Plaintiff was not informed or aware that she was exposed and inhaling EtO, and therefore, did not consent to being exposed to these contaminants.

150.    As a direct and proximate result of Defendant's conduct, the Plaintiff has suffered harm causing distress, anxiety, and a diminished quality of life due to her breast cancer and other health impacts.

151.    Plaintiff seeks compensatory and punitive damages in an amount to be determined at trial, as well as any other relief this Court deems just and proper.

**COUNT VIII**
**Private Nuisance**
**Article 277 of the Puerto Rico Code of Civil Procedure (32 L.P.R.A. § 2761)**
**Against Each Defendant Individually and Collectively**

152.    Plaintiff incorporates allegations in paragraphs 1-82 as if fully set forth herein.

153.    Puerto Rican law provides:

Anything which is injurious to health … so as to interfere with the comfortable enjoyment of life or property, or that is a nuisance to the well being of a neighborhood, or to a large number of persons … constitute a nuisance and the subject of an action. Such action may be brought by any person, public agency or municipality whose property is injuriously affected or whose personal enjoyment is lessened by the nuisance, and by the judgment the nuisance may be enjoined or abated, as well as damages recovered. Art. 277, Puerto Rico Code of Civil Procedure, 32 L.P.R.A. § 2761

154.    Defendants' conduct has caused unreasonable and substantial interference with the Plaintiff's comfortable enjoyment of her life and property, leading to her breast cancer, medical

costs, and diminished enjoyment of life and property due to the ongoing contamination of the air she breathes.

155.    The cost of these harms have been unreasonably borne by Plaintiff, who has suffered, and continues to suffer, losses by having to pay the cost to abate these risks to her health and property.

156.    Defendants' conduct was a substantial factor in causing Plaintiff to have to pay these costs and damages.

157.    The Defendants knew with substantial certainty that their acts and/or omissions regarding the release of EtO would have a detrimental effect on the health and property of the Plaintiff.

158.    As a result of the private nuisance caused by Defendants, Plaintiff has suffered physical and emotional injury, medical expenses, property damage, and a reduced quality of life.

<u>**COUNT IX**</u>
<u>**Trespass**</u>
<u>**Against Each Defendant Individually and Collectively**</u>

159.    Plaintiff incorporates allegations in paragraphs 1-82 as if fully set forth herein.

160.    Plaintiff is the owner, operator, and actual possessor of real property as defined herein.

161.    Defendants designed, manufactured, distributed, marketed, sold, and used ETO formulas and ETO-containing products with the actual knowledge and/or substantial certainty that EtO would be released into the community, including Plaintiff's home, causing contamination.

162.    Defendants negligently, recklessly, and/or intentionally designed, manufactured, distributed, marketed, sold, and used EtO in a manner that caused EtO to contaminate Plaintiff's property.

163.    As a direct and proximate result of Defendants' trespass, Plaintiff has suffered and continues to suffer property damage leading to devaluation of property and requiring investigation and monitoring costs.

164.    Defendants knew that it was substantially certain that their acts and omissions described above would threaten public health and cause extensive contamination of property.

165.    Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of others, and for Plaintiff's property rights.

## COUNT X
### Restitution – Unjust Enrichment
### Against Each Defendant Individually and Collectively

166.    Plaintiff incorporates allegations in paragraphs 1-82 as if fully set forth herein.

167.    Defendants have avoided liability for these costs.

168.    In equity and fairness, it is the Defendants, not the Plaintiff, who should bear the costs of healthcare for the Plaintiff. As a result, the Defendants have been unjustly enriched to the extent that the Plaintiff has to pay these costs.

169.    As a result of the Defendants' acts and omissions specified herein, the Plaintiff was forced to spend far excessive amounts of money on actual healthcare costs to identify and remedy her medical needs.

## COUNT XI
### Punitive Damages Pursuant to 31 L.P.R.A. § 10803
### Against Each Defendant Individually and Collectively

170.    Plaintiff incorporates allegations in paragraphs 1-82 as if fully set forth herein.

171.    Defendants engaged in willful, wanton, malicious, and/or reckless conduct that caused the foregoing damage upon Plaintiff, disregarding her protected rights.

172.    Defendants' actions were deceitful.

173.    Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to Defendants' failure to take all reasonable measures to ensure EtO would not be released into the environment and inevitably contaminated the air Plaintiff breathes and continues to contaminate her air with EtO causing Plaintiff significant injury and damage. Defendants have caused great harm to Plaintiff, acting with implied malice and an outrageously conscious disregard for plaintiff's rights and safety, such that the imposition of punitive damages is warranted.

### Declaratory Judgement

174.    Plaintiff incorporates allegations in paragraphs 1-82 as if fully set forth herein.

175.    Plaintiffs seek a declaration pursuant to 28 U.S.C. §§ 2201-2202.

176.    There exists an actual, substantial and immediate controversy warranting this Court's declaration of the responsibilities of Defendants for the costs incurred and to be incurred by Plaintiff as a result of Defendants' failure to take all reasonable measures to ensure EtO would not be released into the environment and inevitably injure Plaintiff.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Sheila M. Garcia Rivera, respectfully requests that this Court enter judgment in her favor and against Defendants, jointly and severally, as follows:

1.    Compensatory damages, including medical expenses, pain and suffering, emotional distress, and property devaluation;

2.    Punitive damages to punish and deter Defendants' gross negligence and reckless conduct;

3.    Costs for medical monitoring due to the increased risk of future health complications;

4.    Injunctive relief;

5.    Declaratory judgment;

6.  Attorneys' fees and costs as permitted by law;

7.  Pre-judgment and post-judgment interest; and

8.  Such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

---

Respectfully Submitted: January 31st, 2025

*/s/ Luis V. Almeida-Olivieri*
Luis V. Almeida-Olivieri (PR Bar #308307)
Melissa K. Sims (*pro hac vice forthcoming*)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, LLC**
1311 Ponce de Leon Ave. Suite 700
San Juan, PR, 00907
Tel: (516) 741-5600
Fax: (516) 741-0128
lalmeida@milberg.com
msims@milberg.com

*-and-*

John Fonda (*pro hac vice forthcoming*)
**NAPOLI SHKOLNIK PLLC**
360 Lexington Avenue, Eleventh Floor,
New York, NY 10017
Tel: (212) 397-1000 |
jfonda@napolilaw.com

*-and-*

Ari Kresch
(PR Bar #309614)
**Kresch Legal Services PR, PLLC**
1225 Avenida Ponce de Leon, Suite 605
San Juan, Puerto Rico 00907
Tel: (800) 529-3476
akresch@1800lawfirm.com

*Counsel for Plaintiffs*