## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**SHEILA M. GARCIA RIVERA**

                Plaintiff,

    v.

**BALCHEM CORP.,** and
**STERI-TECH, INC.**

                Defendants.

**CASE NO. 3:25-cv-01056-CVR**

**JURY TRIAL DEMANDED**

## AMENDED COMPLAINT FOR
## THE FOLLOWING CAUSES OF ACTION

**COUNT I: Negligence**
**COUNT II: Private Nuisance**
**COUNT III: Abnormally Dangerous Activity**
**COUNT IV: Failure to Warn or Instruct**
**COUNT V: Design Defect**
**COUNT VI: Violation of the Clean Air Act - 42 U.S.C. § 7604**

## NATURE OF THE ACTION

1.    For over 35 years, Ethylene oxide ("EtO"), officially recognized as a human carcinogen by the Environmental Protection Agency ("EPA"), has been continuously released into the air in Salinas, Puerto Rico, detrimentally affecting the health and well-being of nearby residents

2.    The EPA has identified the primary source of these emissions as a sterilization facility ("Facility") owned and operated by Steri-Tech, Inc. ("Steri-Tech"). The supplier of the EtO used on Steri-Tech's Facility is Balchem Corp ("Balchem").

3.    The health implications of continuous EtO exposure are significant and well documented, encompassing a wide range of cancers, including breast cancer. Even short-term exposure to this toxin can initiate a slew of symptoms such as respiratory issues, nausea, headaches, fatigue, and neurological disorders

4.    Plaintiff, Sheila M. Garcia Rivera, has continuously resided within the toxic emissions exposure zone of the Facility—initially within 1000 feet from 1986 to 2012, and subsequently within one mile from 2012 to the present. As a result of this ongoing exposure, she was diagnosed with breast cancer in 2019 and remains at substantial risk of additional or future injuries as a result of the continuing release of EtO from the facility.

5.    This complaint seeks injunctive relief and a declaratory judgment under the citizen suit provision of the Clean Air Act, damages on Ms. Rivera's behalf, and compensation for medical expenses and other harms suffered due to her prolonged exposure to EtO emissions.

## INTRODUCTION

6.    This action arises from the reasonably foreseeable contamination of the air surrounding the Steri-Tech Facility due to its use of EtO supplied by Balchem.

7.    Balchem did more than supply EtO to Steri-Tech—it actively shaped how the chemical was handled. Through recurring "product stewardship" trainings, Balchem provided operational guidance on EtO handling directly to Steri-Tech personnel.

8.    In doing so, Balchem assumed an ongoing role in the practices that led to harmful emissions. These training courses were not incidental; they contributed to how EtO was managed at the Facility and, by extension, to the contamination affecting the surrounding community.

9.    EtO was first listed in the *Fourth Annual Report on Carcinogens* in 1985 as reasonably anticipated to be a human carcinogen, based on evidence from studies in both humans and experimental animals. It was later classified as "known to be a human carcinogen" in the Ninth Report on Carcinogens in 2000.

10.    Defendants disregarded EtO's harmful properties as an environmental toxin, resulting in dangerous volumes of EtO being released into the surrounding community.

11.    For decades, Defendants —including Balchem, through its provision of EtO and its training on its handling— have caused, contributed to, and perpetuated the release of substantial quantities of EtO from the Steri-Tech Facility into the surrounding Salinas community. These emissions have significantly increased the risk of cancer, including breast cancer, among residents.

12.    Defendants never informed Ms. Garcia Rivera that their conduct, including the unsafe handling protocols they implemented, directed, or reinforced, would result in the systematic release of a known human carcinogen into her community's air. Nor did Defendants warn or take reasonable precautions to warn Ms. Garcia Rivera that she would be routinely and continuously inhaling the human carcinogen as a result of their practices.

13.    Ms. Garcia Rivera was unaware that she was being exposed to toxic EtO emissions for decades.

14.     Through their industrial processes, Defendants worked in concert to emit EtO into the air, allowing it to be carried by the wind and natural air movement throughout the area surrounding the Facility. As a result, Ms. Garcia Rivera has been unknowingly and continuously exposed to carcinogenic EtO—at levels associated with a cancer risk 600 times the national average.

15.     At all relevant times, the Defendants knew, or should have known, that EtO is dangerous, toxic, carcinogenic, mutagenic, and causes various illnesses. There is no known safe level of EtO exposure; its carcinogenic and DNA-damaging effects have been widely studied and known since the 1940s and definitively known to Defendants since at least 1985.

16.     Notwithstanding the known risks, Defendants chose to operate in a manner that caused EtO emissions in a densely populated area —one that includes Ms. Garcia Rivera's home, as well as nearby children, houses, parks, schools, and businesses.

17.     On February 7, 2023, the Union of Concerned Scientists published an intensive report ("USC report") on the exposure of EtO to communities in Puerto Rico.

18.     The Union of Concerned Scientists found that the maximum cancer risk levels from Steri-Tech's EtO emissions are 6,000 cases per 1 million people.

19.     EtO exposure is particularly hazardous due to its ability to cause severe DNA damage, even at low exposure levels. It is linked to cancers such as breast, leukemia, and lymphoma, among others, and poses serious risks to reproductive health.

20.     Ms. Garcia Rivera seeks compensation for her physical injuries, emotional distress, and medical expenses resulting from her exposure to EtO, as well as punitive damages due to Defendants' reckless disregard for public health.

## **PARTIES**

21.    **Plaintiff**: Sheila M. Garcia Rivera is a natural person and a resident of Salinas, Puerto Rico.

22.    Ms. Garcia Rivera resided in the *La Margarita* community in Salinas, Puerto Rico since 1978. In 1986, Steri-Tech began sterilization operations using EtO, less than 1000 feet from her home. In 2012, she moved to a home less than one mile from Steri-Tech. She was diagnosed with breast cancer in 2019, a condition attributable to her prolonged exposure to EtO emissions from Steri-Tech's facility.

23.    **Defendants** The term "Defendants" refers to all Defendants named herein jointly and severally.

24.    **Defendant Balchem Corp.** ("Balchem") is a Maryland corporation with its principal place of business in Montvale, New Jersey. Balchem manufactures and distributes the commercial sterilant products containing, in part or in full, the EtO, which is used in the sterilization processes at Steri-Tech.

25.    **Defendant Steri-Tech, Inc.** ("Steri-Tech") is a Puerto Rican corporation operating a sterilization facility in Salinas, Puerto Rico. Since 1986, Steri-Tech has emitted substantial amounts of EtO into the surrounding community, where Ms. Garcia Rivera resides.

## JURISDICTION AND VENUE

26.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case arises under the laws of the United States, the Clean Air Act, 42 U.S.C. § 7401 et seq. The Clean Air Act provides for a private right of action under 42 U.S.C. § 7604, giving Ms. Garcia Rivera standing to bring this claim.

27.     The Court also has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367, as they are part of the same case or controversy under Article III of the United States Constitution.

28.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Ms. Garcia Rivera's claims occurred in this District, and Defendants conduct business here.

## FACTUAL ALLEGATIONS

**I.     Ethylene Oxide is Abnormally Dangerous—Even Among Human Carcinogens.**

29.     Upon information and belief, EtO is primarily produced on an industrial scale through the catalytic oxidation of ethylene.

30.     EtO is a highly reactive, colorless, and flammable gas used extensively in industrial sterilization processes. Commercial/industrial medical-equipment sterilizers use EtO in their sterilization processes.

31.     Through its industrial processes, Steri-Tech emits EtO into the air, allowing it to be carried by the wind and natural air movement throughout the area surrounding the facilities.

32.     EtO has been linked to various forms of cancer, including breast cancer, non-Hodgkin's lymphoma, multiple myeloma, and lymphocytic leukemia.

33.     EtO is highly reactive, readily absorbed by the lungs, efficiently distributed into the bloodstream, and easily distributed throughout the human body.

34.     In identifying ethylene oxide as carcinogenic to humans (Group 1), the IARC Working Group (2012) also relied on mechanistic data.

35.    The United States National Toxicology Program (National Toxicology Program 2014) and the EPA emphasize the importance of data on mechanistic pathways (by which agents may act as carcinogens) in cancer risk assessments (EPA 2005) (Krewski et al., 2019). [1]

36.    Electrophilic[2] properties and genotoxicity[3] are considered the most significant characteristics of a carcinogen (Smith et al., 2016).

37.    There is strong evidence that ethylene oxide, a direct-acting alkylating agent, exerts its carcinogenic effects through a genotoxic mechanism. It induces heritable translocations in the germ cells of rodents, a dose-related increase in sister chromatid exchanges, chromosomal aberrations, and micronucleus formation in lymphocytes of exposed workers.

38.    A recent analysis by the IARC Monographs Programme examined mechanistic data from the IARC Monographs for 86 Group 1 human carcinogens, identifying genotoxicity as the most common mechanistic characteristic of ethylene oxide.

---

[1] Krewski D, Bird M, Al-Zoughool M, Birkett N, Billard M, Milton B, Rice JM, Grosse Y, Cogliano VJ, Hill MA, Baan RA, Little J, Zielinski JM. Key characteristics of 86 agents known to cause cancer in humans. J Toxicol Environ Health B Crit Rev. 2019;22(7-8):244-263.

[2] Electrophilic (electron-seeking) properties of a chemical is the most significant characteristic of carcinogen. Electrophilic molecules are commonly form addition products, generally referred to as adducts, with DNA, RNA and proteins. Some chemical carcinogens belong to the direct-acting electrophiles (e.g., ethylene oxide, formaldehyde, sulfur mustard), whereas others (e.g. polycyclic aromatic hydrocarbons and benzene) require metabolic activation / biotransformation by enzymes to ultimate carcinogenic and reactive forms (Miller, 1970).

[3] The term "genotoxic" refers to an ability of agent to induce DNA damage in the form of DNA adducts, single- or double-strand breaks, oxidized or fragmented nucleotide bases, covalent binding to the bases. The DNA damage generally does not alter the linear sequence of nucleotides (or bases) in the DNA. Gene mutation is defined as a change in the normal nucleotide DNA sequence, which usually arises as the cell attempts to repair the DNA damage and may have a central role in human carcinogenesis (Ding et al., 2008). Clastogenic effects refers to damage to chromosomes, including DNA breakage, or the rearrangement, gain, or loss of chromosome fragments (Snyder 2010).

39.    Further, some carcinogens (e.g., ethylene oxide), which do not require metabolic activation or modification to induce cancer, are called direct-acting or activation-independent carcinogens.

40.    Usually, existing as highly reactive electrophilic molecules, direct-acting carcinogens directly interact with and bind to cellular macromolecules, including DNA. Due to this high reactivity, direct-acting carcinogens frequently result in tumour formation at the site of chemical exposure. Such carcinogens and their DNA reactive metabolites are classically considered to represent risk factors at all concentrations since even one or a few DNA lesions, according to the concept of a non-threshold mode of action, which may, in principle, result in mutations and, thus, increase tumour risk (Hartwig et al., 2020).[4]

41.    In general, genotoxic carcinogens, especially direct mutagens like EtO, due to their DNA interaction properties, exert their effects even at undetectably low dosages.[5]

42.    Despite knowing that ethylene oxide is a highly toxic and carcinogenic chemical, Defendants chose to operate their businesses in a way that resulted in its uncontrolled release near Ms. Garcia Rivera's home. Balchem supplied EtO to the Steri-Tech facility and provided training on its handling—training that, upon information and belief, failed to prevent unsafe emissions. Steri-Tech then used the EtO in a manner that allowed it to escape into the surrounding air.

---

[4] Hartwig A, Arand M, Epe B, Guth S, Jahnke G, Lampen A, Martus HJ, Monien B, Rietjens IMCM, Schmitz-Spanke S, Schriever-Schwemmer G, Steinberg P, Eisenbrand G. (2020) *Mode of action-based risk assessment of genotoxic carcinogens*. Archives of Toxicology. 94, 1787-1877.

[5] Research suggests EtO has a currently undetectably low minimal dose required for effect ("no-threshold effect"). See Aoki Y. (2016) *Possible Determinant of the Threshold for Carcinogenesis*. In: Thresholds of Genotoxic Carcinogens from Mechanisms to Regulation. Eds: Takehiko Nohmi and Shoji Fukushima. Tokyo. Academic Press is an imprint of Elsevier. pp.155-170.

43.    Ms. Garcia Rivera, who has lived within a mile of the facility for decades, was never warned of this risk and has been continuously exposed to elevated levels of EtO as a result of Defendants' coordinated conduct.

44.    Furthermore, although technologies to better control and warn regarding EtO emissions have been available and widely used since—at least—the 1980s, Steri-Tech operated in Puerto Rico for decades without utilizing available practices and control technologies to reduce its emissions.

45.    As sophisticated corporations and long-term suppliers, handlers and/or users of EtO, Defendants had access to scientific data, regulatory findings, and internal knowledge confirming the chemical's carcinogenic risks —knowledge far beyond what was available to the public or Ms. Garcia Rivera. Despite this superior knowledge and access to information, Defendants failed to disclose these dangers or implement safeguards that would have protected her from prolonged harmful exposure.

46.    While the harmful properties of EtO are not widely known to the average person who is not involved in the business of EtO sterilization, the harmful properties of EtO have been known—or should have been known—to Defendants and anyone in the business of manufacturing, distributing, using and emitting EtO as part of a sterilization process, for decades. By way of example:

   a.  In a 1977 article, the National Institute of Occupational Safety and Health ("NIOSH") concluded that occupational exposure to EtO may increase the frequency of genetic mutations in humans. The NIOSH report also raised concerns about the potential carcinogenicity of EtO.

   b.  In 1981, NIOSH released a subsequent report which recommended that EtO be regarded in the workplace as a potential occupational carcinogen. NIOSH based its recommendation on new evidence of EtO's carcinogenic, mutagenic, and reproductive hazards, including studies demonstrating that EtO induced cancer in experimental animals. Specifically, the studies showed an increase in instances of leukemia in line with increases of EtO concentrations, in addition to other adverse effects on

reproductive health. An epidemiological investigation of Swedish workers exposed to EtO also revealed increased incidences of leukemia and other cancers.

c.  In 1985, the U.S. Department of Health and Human Services published the Fourth Annual Report on Carcinogens and classified EtO as reasonably anticipated to be a human carcinogen.

d.  In the early 1990s, NIOSH published the largest and most informative epidemiological study of EtO. The study analyzed over 18,000 employees working with EtO at fourteen different industrial facilities sterilizing medical equipment and food spices. The study found sufficient evidence to support a causal link between exposure to EtO and increased mortality from lymphatic and hematopoietic cancers. Follow-up studies have additionally demonstrated an association between EtO exposure and breast cancer.

e.  In 1994, as a result of these findings, the World Health Organization ("WHO") listed EtO as a Group 1 human carcinogen—the agency's highest risk classification—finding EtO to be carcinogenic to humans.

f.  In 2000, following suit, the U.S. Department of Health and Human Services reclassified EtO to "known to be a human carcinogen."

g.  The U.S. Department of Labor's Occupational Safety and Health Administration's (hereinafter "OSHA") 2002 fact sheet on EtO indicates that "[b]oth human and animal studies show that EtO is a carcinogen" and requires employers to provide clear signs and labels notifying workers of EtO's "carcinogenic and reproductive hazards."[6]

h.  In 2016, the EPA's Integrated Risk Information System similarly reclassified EtO as carcinogenic to humans and increased—by a multiple of 30 in adults and 60 in children—its estimate of EtO's cancer potency.[7]

## II.    Defendants Exposed Ms. Garcia Rivera to Dangerous Levels of EtO.

47.    Despite knowing these risks, Steri-Tech's EtO sterilization process—actively shaped by Balchem's recurring "product stewardship" trainings and operational guidance on EtO handling—did not comply with safe and prudent methods of EtO sterilization.

---

[6] See, Occupational Safety and Health Administration (OSHA), *OSHA Fact Sheet: Ethylene Oxide*, https://www.osha.gov/OshDoc/data_General_Facts/ethylene-oxide-factsheet.pdf, (last accessed: February 9, 2024).

[7] Max Blau and Lylla Younes, *The Dirty Secret of America's Clean Dishes*, ProPublica (Dec. 20, 2021) https://www.propublica.org/article/the-dirty-secret-of-americas-clean-dishes, (last accessed: February 9, 2024).

48.     At all relevant times, Steri-Tech—by way of failure to implement control measures to limit emissions, failure to upgrade sterilization equipment, intentional shortening of EtO degassing/aeration/quarantining time, and/or other unsafe practices—subjected Ms. Garcia Rivera to unhealthy and dangerous levels of EtO to increase profits and/or cut costs.

49.     At all relevant times, both Steri-Tech and Balchem failed to provide adequate training to Steri-Tech's employees and managers, resulting in unsafe practices that led to risky EtO sterilization procedures.

50.     Defendants knew faulty/ineffective training systems, faulty/ineffective supervision, and employees' inability to perform their jobs safely.

51.     On August 22, 2018, the U.S. EPA released the 2014 National Air Toxic Assessment ("NATA")—a screening tool that estimates cancer risks based on emission data in 76,727 census tracts across the United States. The 2014 NATA revealed 109 census tracts in the United States with cancer-risk scores greater than 100 cases per one million people exposed to toxic air pollution during their lifetime, more than what the U.S. EPA considers "acceptable" limits.

52.     The health impacts of exposure to EtO have been extensively researched, and the adverse consequences are well documented. Presently, there is evidence linking exposure to increased risk of lymphohematopoietic cancer, such as non-Hodgkin lymphoma, multiple myeloma, and lymphocytic leukemia; breast cancer; tumors in the lungs, uterus, and the brain; and reproductive and developmental impairments, including increased rate of miscarriages and infertility.

53.     Commercial medical equipment sterilizers use the EtO sterilization process on over 20 billion healthcare products annually in the United States. The EtO sterilization process begins by placing medical equipment in a gas chamber. After air is pumped out of the chamber, EtO is

injected and allowed to diffuse into the products for several hours. Once the medical equipment is sterilized, the EtO is pumped out of the chamber, and the remaining EtO is allowed to dissipate slowly. Each time this sterilization cycle is run, EtO is emitted—whether through controlled or uncontrolled emissions known as "fugitive emissions"—into the air and inhaled by the surrounding community.

54.    The EPA's required tracked emission figures do not accurately account for these fugitive emissions, which include untracked ventilation resulting from inadequate maintenance, faulty design, and other unaccounted-for escape pathways for this highly explosive air toxin.

55.    EtO is extremely flammable and explosive in its room-temperature gaseous form; therefore, it is typically handled and shipped as a refrigerated liquid to mitigate these risks.

56.    EtO is so explosive that it is used as a key ingredient in thermobaric and "fuel-air explosive" weapons utilized by the US military, commonly known as "vacuum bombs." These bombs often create a smoke plume resembling an atomic mushroom and exhibit blast characteristics akin to "mini-nukes." They rank among the most potent non-nuclear weapons in the United States' inventory. EtO is favored for military applications due to its shock wave effectiveness of 5:1 compared to dynamite—meaning that to achieve the same shock wave produced by 5 pounds of dynamite, only 1 pound of EtO is required.[8]

57.    In addition to EtO's explosive quality, it is also odorless—unless one inhales very concentrated amounts, which is effectively only possible in occupational exposure scenarios. Other industries that handle chemicals with these characteristics, such as the liquified petroleum gas industry, combine an additive with their products to alert users and other nearby individuals of

---

[8] Meyer R, Köhler, J., Homberg A. *Explosives. 6th ed*. Weinheim, Germany: Pg. 142.

leaks. Such measures have proven effective in alerting propane users to a problem and giving them the time they need to ensure their safety.

58.    Yet, despite EtO's odorless and explosive properties, Balchem has failed to incorporate or require comparable safety measures, such as odorants or other leak-detection systems, that would alert surrounding communities or workers to dangerous releases.

59.    Balchem also failed to implement or require, through their "product stewardship" trainings and operational guidance, meaningful safety protocols for the handling of EtO at the facilities it supplied, offering no publicly accessible or enforceable safeguards to ensure that its customers managed the chemical in a manner protective of nearby communities.

60.    Balchem Corp. is a global leader in the manufacture, production, sale and distribution of performance gases, including EtO. EtO from Balchem is distributed in cylinders and drums worldwide, as stated on the Balchem Corp. website. Page 5 of the August 24, 2022, data sheet available on the website (only in English) presents the following warning:

> Statement of Hazards: DANGER! Extremely flammable liquid and gas under pressure. May form explosive mixtures with air. Highly Reactive. Harmful or fatal if inhaled and may cause delayed lung injury, respiratory system and nervous system damage. Inhalation may cause dizziness or drowsiness. Liquid contact may cause frostbite. May cause allergic skin reaction. Harmful if swallowed. May cause adverse blood effects, liver and kidney damage based on animal data. Cancer and reproductive hazard.
> HAZARD RATINGS: (0 = minimum; 4 = maximum) HMIS Rating:
> Health = 3
> Flammability = 4
> Reactivity = 3

61.     According to the EPA, Balchem is the only EtO "technical registrant".[9] A technical registrant is a company or individual that owns the source of the active ingredient in a pesticide product and has registered it with the EPA.[10]

62.     A technical registrant is responsible for providing the data and information to support the safety and efficacy of the active ingredient, as well as complying with the EPA's regulations and requirements. A technical registrant typically has a significantly greater investment, as well as greater responsibilities and liabilities, than an end-use product registrant.

63.     Further, Balchem provides training to Steri-Tech employees on handling and use of EtO.[11]

64.     In contrast to Balchem's avowed undertaking of a stewardship role on consumer and community safety actions, in its words fundamental to its license to operate, Balchem has a history of shirking safety responsibilities and obligations relating to its EtO products.

65.     On July 11, 2023, the Occupational Safety and Health Administration (OSHA) announced it issued a $393,798 fine to Balchem Corp.'s subsidiary, BCP Ingredients, Inc., after agency inspectors found dozens of serious safety and health violations at the company's chemical manufacturing plant.[12]

---

[9] United States Environmental Protection Agency (EPA), *Ethylene Oxide Proposed Interim Registration Review Decision Case Number 2275*, (March, 2023) https://www.epa.gov/system/files/documents/2023-04/eto-pid.pdf, (last accessed: February 9, 2024).

[10] United States Environmental Protection Agency (EPA), *How to Register a Pesticide – A Guide for Applicants New to the Process*, https://www.epa.gov/pesticide-registration/how-register-pesticide-guide-applicants-new-process, (last accessed: February 9, 2024).

[11] *See* **Exhibit 2**, Declaration of Emely Hernandez, ¶¶ 23-27. The full Declaration is incorporated herein by reference, in the interest of judicial economy.

[12] Guy Burdick, *OSHA Issues A Pair of Six-Figure Fines*, EHS DAILY ADVISOR (July 13, 2023), https://ehsdailyadvisor.blr.com/2023/07/osha-issues-a-pair-of-six-figure-fines/ (last accessed: February 9, 2024).

66.     In October of 2021, OSHA cited the same facility for 24 serious safety and health violations, including inadequate medical evaluation procedures for workers exposed to ethylene oxide.[13]

67.     Balchem's wholly owned subsidiary BCP Ingredients, Inc. was cited for safety violations which included:

    a.  Inadequate process safety management procedures and monitoring;

    b.  Failing to develop an emergency evacuation plan;

    c.  Failing to train workers on actions to take in the event of a chemical release;

    d.  Exposing respirators to ethylene oxide while in storage; and

    e.  Allowing electrical safety hazards.[14]

68.     On January 31, 2025, the Western District of Missouri entered a Consent Order in resolution of the EPA's Complaint that BCP Ingredients had failed to prepare and implement a risk management plan to detect and prevent or minimize accidental release of hazardous chemicals, including EtO at its chemical manufacturing and re-packaging facility in Verona Missouri. U.S. v. BCP Ingredients, Inc. 3:24cv-5094-BP, Doc. 6. (W.D. Mo. January 31, 2025). The Consent Order provided that BCP Ingredients Inc. would pay a fine of $300,000,.00, install an additional EtO Scrubber, demonstrate removal efficiency of at least 99.95% of EtO, spend no less than $80,000 to purchase two vehicle  for local communities to use as Mobile Health units, spend no less than $220,000 for medical visits for the communities, and spend no less than $50,000 for emergency response equipment for the communities

---

[13] U.S. Department of Labor, Occupational Safety and Health Administration, *Citation and Notification of Penalty,* (October 1, 2021), www.dol.gov/sites/dolgov/files/OPA/newsreleases/2021/10/OSHA%2020211760A.pdf (last accessed: February 9, 2024). (last accessed: February 9, 2024).

[14] *Id.*

69.    "Ethylene oxide is a colorless and flammable gas and unsafe exposure can cause cancer and other serious health issues," Karena Lorek, OSHA's Kansas City, Missouri, area director, said in an agency statement. "The company's failure to address its previous violations and follow OSHA regulations is troubling. BCP needs to bring its monitoring procedures into compliance immediately and re-evaluate its engineering processes to make sure its employees are kept safe and healthy."

70.    Balchem distributes the EtO they manufacture to Steri-Tech through Mays Chemical Company of Puerto Rico, Inc., a third-party who provides freight services and delivers the EtO to the Facility[15].

71.    Unfortunately, Balchem's training is woefully inadequate. For instance, while Balchem provided dedicated training to Steri-Tech employees every two years on practices for handling EtO, employees hired between the two-year gaps of Balchem's training were only given printed copies of the presentations used by Balchem's training personnel, with no additional guidance or explanation provided before they started work.[16]

72.    Balchem, having voluntarily undertaken to provide training to Steri-Tech's employees, had a duty to exercise reasonable care in the performance of that training and is liable to others for physical harm resulting from its failure to exercise reasonable care if its failure increased the risk of injury or harm was suffered because other relied on that undertaking. Restatement (Second) of Torts, §323. *See Munz-Rivera v US*, 204 F. Supp. 2d 305 (D. P.R. May 20, 2002).

---

[15] See **Exhibit 1**, Bill of Lading, by Mays from Balchem to Steri-Tech.

[16] **Exhibit 2** at ¶ 27.

73.    Balchem, having voluntarily undertaken to provide "product stewardship" training to Steri-Tech regarding the handling of ethylene oxide, assumed a duty to exercise reasonable care in performing that undertaking.

74.    Courts have found that where a company voluntarily undertakes to influence how others manage hazardous substances, particularly through technical instruction or guidance, it may owe a duty of care to those foreseeably affected, even absent a statutory or contractual mandate. See Restatement (Second) of Torts § 323 (Am. L. Inst. 1965); *Brettell v. Omron Scientific Technologies, Inc.*, 302 F. Supp. 3d 460 (D. Mass. 2018).

75.    Balchem is strictly liable for its manufacture, distribution and sale of EtO, which causes physical harm to users and consumers commensurate with the Restatement (Second) of Torts § 402A. This liability extends to products that have not been processed before sale. *Id*. comment e. This liability extends to those foreseeably harmed by the product. *See Quilez-Velar v .Ox Bodies, Inc.* 2014 WL 2003813 (D. P.R. May 16, 2016).

76.    It is believed that these were not unique situations or events among Balchem's industrial EtO customers, to whom Balchem owed a duty to ensure its remarkably ultrahazardous gas product was handled, stored, and used appropriately before entrusting the product to them. Instead, this is another in a common pattern and practice of willful, wanton, or reckless behavior on Balchem's part regarding EtO sterilant products and its sterilant customers.

77.    Despite its knowledge of the serious dangers associated with EtO emissions, Balchem failed to take reasonable and legally permissible steps to update its product labelling or issue supplemental warnings. Federal law allows manufacturers of antimicrobial pesticide products like EtO to implement minor modifications to their labelling—such as clarifying directions for use—without prior approval from the Environmental Protection Agency (EPA). See

40 C.F.R. § 152.46. These modifications may be made either upon notifying the EPA or, where no adverse environmental impact is expected, without any notice at all. See 40 C.F.R. § 152.46(a)–(b). Under these rules, Balchem could have included clear instructions prohibiting the venting of EtO into the open air or requiring emission controls, such as scrubbers—label changes that would have protected nearby residents, like Plaintiff, without violating EPA regulations.

78.    Balchem was not limited to labelling changes. Federal law does not preempt manufacturers from providing separate warnings or safety instructions through product stewardship programs, safety data sheets, signage, or public communications. Balchem could have required industrial users like Steri-Tech to post visible warnings outside the facility, distribute notices to surrounding communities, or conduct basic outreach to inform the public of the health risks posed by EtO emissions. It could have added odorants to EtO to aid in public detection, as is required for other hazardous substances under federal safety regulations. See 49 C.F.R. § 192.625. Balchem's failure to take any of these steps—despite their feasibility and regulatory permissibility—supports Plaintiff's claim that it breached its duty to warn of foreseeable and preventable harm to the surrounding community.

79.    Thus, through the industrial processes conducted at the Facility—coupled with the lack of proper customer vetting, end user training, and compliance monitoring by Balchem—over many years, the Salinas plant emitted dangerous amounts of EtO into the air, thereby poisoning the air in Ms. Garcia Rivera's community. Defendants failed independently and collectively to implement adequate safety measures to limit emissions or notify residents, including Ms. Garcia Rivera, of the health risks.

### III.    Defendant Steri-Tech Violated the Clean Air Act ("CAA").

80.    Steri-Tech's facility emits EtO through several key mechanisms, including:

a.  Smokestack Emissions: After the sterilization process, exhaust treated from the sterilization chambers is released into the atmosphere through the facility's smokestack. This emission is supposed to be controlled by a thermal oxidizer, which is designed to break down EtO before it reaches the environment.

b.  Fugitive Emissions: EtO can escape through unmonitored and unreported pathways, such as leaks from storage tanks, handling equipment, and ventilation systems. These fugitive emissions often go unaccounted for, increasing the overall EtO release from the facility.

c.  Ventilation System Emissions: During the sterilization and aeration phases, residual EtO is vented from chambers and released into the air, further contributing to harmful emissions.

81.  Despite being subject to strict regulations under the National Emission Standards for Hazardous Air Pollutants (NESHAP) for Sterilization Facilities (40 C.F.R. Part 63, Subpart O), Steri-Tech has consistently violated CAA standards.[17]

82.  First, Steri-Tech failed to maintain required oxidation temperatures. Steri-Tech's thermal oxidizer, which is required to operate at a minimum temperature of 1,521°F to achieve 99% destruction of EtO, has consistently operated below this threshold. EPA inspections recorded temperatures between 700°F and 900°F, allowing excessive amounts of EtO to escape into the atmosphere. This failure violates 40 C.F.R. § 63.362(c), 63.363(a)(1), and 63.363(b)(3), as well as Section 112 of the CAA, and exposed Ms. Garcia Rivera and the community to dangerous levels of EtO.

83.  Second, Steri-Tech failed to comply with continuous monitoring and reporting requirements: Steri-Tech is required to continuously monitor and report the temperatures of its thermal oxidizer to ensure compliance with CAA standards. However, the facility failed to install necessary monitoring equipment and did not maintain accurate records, violating 40 C.F.R. §§

---

[17] In the matter of Steri-Tech, Inc Compliance Administrative Order, Docket No. CAA-02-2024-1001.

63.363(f) and 63.364(c), as well as Section 112 of the CAA. As a result, actual EtO emissions were underreported, putting Ms. Garcia Rivera and nearby communities at risk.

84.     Third, Steri-Tech failed to demonstrate compliance with Catalytic Recuperative Oxidizer (CRO) standards: Steri-Tech installed a CRO in 2022, but has faced multiple operational failures, including explosions when EtO concentrations exceeded safety limits. The facility failed to demonstrate that the CRO can achieve the required 99.9% destruction efficiency for EtO, in violation of both its operating permit and NESHAP regulations.

85.     These violations demonstrate a clear pattern of noncompliance with the CAA, posing a significant public health risk to Ms. Garcia Rivera and the surrounding communities.

86.     Under Section 304 of the CAA, 42 U.S.C. § 7604, on October 29, 2024, Plaintiffs provided a formal Notice of Intent to Sue to Steri-Tech and the relevant state and federal agency heads regarding Steri-Tech's operations in Salinas, Puerto Rico. As of December 28, 2024, sixty (60) days have passed since the notice was served. Neither the EPA nor the Puerto Rico Department of Natural and Environmental Resources is diligently prosecuting the violations described in the notice. Accordingly, Ms. Garcia Rivera now brings this action to address the ongoing violations and seeks appropriate relief under the law.

**IV.    Defendants' Knew of and Failed to Address Decades of Deadly Emissions Sufficiently.**

87.     At all relevant times, Defendants knew or should have known that EtO is dangerous, toxic, carcinogenic, and poses a serious threat to human health. The risks associated with EtO have been well-known in the scientific and regulatory communities since the 1980s.

88.     Despite this knowledge, Steri-Tech failed to use available technologies to control emissions, failed to warn Ms. Garcia Rivera and other residents of the risks, and continued to emit EtO into the air in quantities far exceeding safe limits.

89.    Defendants' actions and omissions were reckless, demonstrating a callous disregard for public safety. Their conduct constitutes negligence, and they are liable for the injuries and damages suffered by Ms. Garcia Rivera.

**V.     Ms. Garcia Rivera's Exposure and Resulting Injury Are Severe.**

90.    Ms. Garcia Rivera lived within 1,000 feet of the Steri-Tech facility from 1986 to 2012 and has lived within one mile of the facility since 2012. At all relevant times, toxic ethylene oxide (EtO) fumes were emitted from the Facility, contaminating the air in surrounding communities, including Salinas. As a result, Ms. Garcia Rivera was unknowingly and continuously exposed to this carcinogenic compound for decades, regularly breathing in contaminated air without her knowledge or consent.

91.    In 2019, Ms. Garcia Rivera was diagnosed with breast cancer. This disease is scientifically linked to EtO exposure and consistent with the types of cancer caused by long-term contact with this carcinogen.

92.    Ms. Garcia Rivera's exposure is continuing and ongoing, which has exacerbated her injuries and placed her at an increased risk of developing other injuries scientifically linked to EtO exposure.

93.    Ms. Garcia Rivera has suffered significant physical and emotional pain as a result of her breast cancer diagnosis. She has undergone surgery, chemotherapy, and radiation, and continues to face ongoing health risks and medical expenses.

94.    The exposure to EtO emissions from the Facility has placed Ms. Garcia Rivera at a heightened risk of developing additional health problems, and she requires continued medical monitoring and treatment.

**VI.     Defendants Prioritize Profit over People, Externalize Risk, and Neglect Safer Alternative Sterilization Options.**

95.     Long-term exposure to EtO increases the risk of cancer, respiratory issues, and other serious health problems. Ms. Garcia Rivera, has resided in the neighborhood around Steri-Tech since 1978. In 1986, Steri-Tech started operations less than 1000 feet from her residence, continuously exposing her to EtO. This exacerbates the injuries and health risks she faces as a result of her ongoing exposure to EtO.

96.     The FDA has actively promoted and approved several alternative sterilization methods. These alternatives reduce reliance on EtO and provide effective and safe sterilization options for medical devices.

97.     Such market alternatives include the following:

| | |
|---|---|
| 1. Hydrogen Peroxide Gas Plasma | Hydrogen peroxide gas plasma[18] is a leading alternative to EtO, utilizing reactive vapor to sterilize medical devices. This method is effective for heat and moisture-sensitive items and offers a rapid sterilization process compared to EtO. The FDA has endorsed this method due to its efficiency and safety profile, making it a suitable choice for many medical applications currently being filled by EtO. |
| 2. Gamma Radiation | Gamma radiation[19] is a well-established sterilization technique that uses high-energy photons to destroy microorganisms. This method is particularly effective for single-use medical products, ensuring sterility without the need for high temperatures or moisture. The FDA recognizes gamma radiation as an environmentally safe, reliable, and effective alternative to EtO, suitable for a wide range of medical devices. |
| 3. Electron Beam (E-Beam) Radiation | Electron beam (E-beam) radiation[20] is another effective sterilization method, utilizing high-energy electrons to sterilize medical equipment. E-beam radiation is precise, efficient, and does not leave any residual chemicals, making it a clean and environmentally friendly option. The |

---

[18] U.S. Food and Drug Administration, *Coronavirus (COVID-19) Update: FDA Issues Emergency Use Authorization to Decontaminate Millions of N95 Respirators*, FDA, (Apr. 12, 2020) https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-issues-emergency-use-authorization-decontaminate-millions-n95.

[19] U.S. Food and Drug Administration, *Food Irradiation: What You Need to Know*, FDA, https://www.fda.gov/food/buy-store-serve-safe-food/food-irradiation-what-you-need-know (last updated Mar. 5, 2024).

[20] *Id.*

|   | | |
|---|---|---|
| | | FDA's support for E-beam sterilization underscores its commitment to promoting safe and effective alternatives to EtO. |
| 4. | Steam Sterilization (Autoclaving) | Steam sterilization[21], or autoclaving, remains a widely used and reliable method for sterilizing heat-resistant medical instruments. This process involves exposing devices to high-pressure saturated steam, effectively killing all microbial life forms. The FDA continues to endorse steam sterilization for its proven efficacy and safety, particularly for the many durable items that can withstand high temperatures. |
| 5. | Vaporized Hydrogen Peroxide (VHP) | Vaporized hydrogen peroxide (VHP)[22] is another alternative method that uses hydrogen peroxide in its vapor form to achieve sterilization. VHP is effective at low temperatures, making it suitable for heat-sensitive medical devices. The FDA has approved VHP as a reliable alternative to EtO, supporting its use in various sterilization applications due to its efficiency and lack of toxic residues. |
| 6. | Peracetic Acid | Peracetic acid[23] is an oxidizing agent used in low-temperature sterilization processes, suitable for heat-sensitive devices. It involves immersing devices in a peracetic acid solution, rapidly killing microorganisms without leaving harmful residues. The FDA's approval of peracetic acid as a sterilization method highlights its commitment to promoting safe and effective alternatives to EtO. |
| 7. | Dry Heat Sterilization | Dry heat sterilization[24] uses high temperatures to sterilize medical devices, particularly those that can withstand prolonged exposure to heat. This method is effective at killing all forms of microbial life and does not involve the use of chemicals. The FDA supports dry heat sterilization for its safety and efficacy, particularly for certain types of medical devices like powders, oils, and metal instruments. |

---

[21] U.S. Food and Drug Administration, *Sterilization for Medical Devices*, FDA, https://www.fda.gov/medical-devices/general-hospital-devices-and-supplies/sterilization-medical-devices (last updated May. 29, 2024).

[22] U.S. Food and Drug Administration, *FDA Facilitates Broader Adoption of Vaporized Hydrogen Peroxide for Medical Device Sterilization*, FDA, https://www.fda.gov/news-events/press-announcements/fda-facilitates-broader-adoption-vaporized-hydrogen-peroxide-medical-device-sterilization (last updated Jan. 8, 2024).

[23] U.S. Food and Drug Administration, *FDA-Cleared Sterilants and High Level Disinfectants with General Claims for Processing Reusable Medical and Dental Devices*, FDA, https://www.fda.gov/medical-devices/reprocessing-reusable-medical-devices-information-manufacturers/fda-cleared-sterilants-and-high-level-disinfectants-general-claims-processing-reusable-medical-and (last updated Nov. 30, 2023).

[24] U.S. Food and Drug Administration, *Sterilization for Medical Devices*, FDA, https://www.fda.gov/medical-devices/general-hospital-devices-and-supplies/sterilization-medical-devices (last updated May. 29, 2024).

| 8. Supercritical Carbon Dioxide (SCCO2) | Supercritical carbon dioxide (SCCO2)[25] sterilization is an emerging technology that uses carbon dioxide in its supercritical state to sterilize medical devices. SCCO2 can penetrate complex device geometries without leaving toxic residues, making it suitable for delicate and heat-sensitive devices. The FDA recognizes the potential of SCCO2 sterilization and supports its development as an additional safe and effective alternative to EtO |
| --- | --- |

98.     Despite the availability of these alternatives, Defendants promoted, marketed, and used EtO as a sterilizing agent in Salinas, to the great detriment of Ms. Garcia Rivera.

99.     Defendants have externalized the costs of their chemical emissions onto residents near the Facility, such as Ms. Garcia Rivera, resulting in an increased risk of disease, environmental degradation, and reduced life expectancy. These costs are not shouldered by the polluter but by the affected public, including Ms. Garcia Rivera. This creates an unjust distortion of the actual economic cost of Defendants' tortious business practices. Justice requires that the polluter internalize those actual costs.

## CAUSES OF ACTION

### COUNT I
### Negligence
### Against Each Defendant Individually and Collectively

100.     Plaintiff incorporates allegations in paragraphs 1-99 as if fully set forth herein.

101.     Defendants knew or should have known harmful levels of EtO were being released from the Steri-Tech Facility into the air of the surrounding communities, including Ms. Garcia Rivera's residence.

---

[25] U.S. Food and Drug Administration, *CDRH Announces Radiation Sterilization Master File Pilot Program*, https://www.fda.gov/medical-devices/medical-devices-news-and-events/cdrh-announces-radiation-sterilization-master-file-pilot-program (last updated Apr. 11, 2023).

102.    At all relevant times, each Defendant owed a duty of care to Plaintiff to prevent her exposure to hazardous levels of EtO.

103.    Steri-Tech, as the operator of the Facility, had a duty to safely handle the EtO, educate, train, and supervise the persons handling the chemical and prevent its release into surrounding communities.

104.    Balchem, having voluntarily undertaken to provide product stewardship training on the handling of EtO, owed a duty to exercise reasonable care in providing that training and in advising on the chemical's safe use.

105.    Defendants breached their respective duties in one or more of the following ways:

   a.    Steri-Tech emitted dangerous volumes of EtO into the air from its Facility, placing nearby residents, including Plaintiff, at significant risk;

   b.    Steri-Tech ignored or underreported test results indicating unsafe EtO levels;

   c.    Balchem failed to exercise reasonable care in training and advising Steri-Tech personnel on the safe handling and use of EtO;

   d.    Balchem, despite knowledge of the chemical's carcinogenic risks, did not require or recommend implementation of effective safeguards to prevent community exposure as part of their product stewardship training;

   e.    Both Steri-Tech and Balchem failed to implement and enforce adequate control measures to contain EtO emissions;

   f.    Both Steri-Tech and Balchem failed to warn Ms. Garcia Rivera that she was being routinely exposed to EtO while living and working in the vicinity of the facility;

g.  Both Steri-Tech and Balchem, through their respective conduct, subjected Ms. Garcia Rivera to ongoing exposure to EtO at levels associated with elevated cancer risk.

106.  As a direct and proximate result of Defendants' negligence, Ms. Garcia Rivera was exposed for decades to hazardous concentrations of EtO—levels far exceeding health-protective thresholds, including those set by the U.S. EPA.

107.  This prolonged, repeated and ongoing exposure caused Ms. Garcia Rivera to develop breast cancer and created a substantial risk of additional long-term health complications.

108.  As a result, Ms. Garcia Rivera has suffered physical injury, emotional distress and incurred medical expenses, and will continue to require ongoing medical monitoring and treatment due to her significant exposure to EtO.

### COUNT II
### Private Nuisance
### Against Each Defendant Individually and Collectively

109.  Plaintiff incorporates allegations in paragraphs 1-99 as if fully set forth herein.

110.  Puerto Rican law provides:

Anything which is injurious to health … so as to interfere with the comfortable enjoyment of life or property, or that is a nuisance to the well being of a neighborhood, or to a large number of persons … constitute a nuisance and the subject of an action. Such action may be brought by any person, public agency or municipality whose property is injuriously affected or whose personal enjoyment is lessened by the nuisance, and by the judgment the nuisance may be enjoined or abated, as well as damages recovered.

Art. 277, Puerto Rico Code of Civil Procedure, 32 L.P.R.A. § 2761

111.    Defendants' conduct has caused serious injury to Ms. Garcia Rivera's health and has interfered with the comfortable enjoyment of her life. For decades, she unknowingly inhaled toxic EtO emissions while living near the Steri-Tech Facility. This prolonged exposure led to her developing breast cancer, which was diagnosed in 2019, and has profoundly affected her ability to enjoy life. The physical and emotional toll of her illness has interfered with her daily routines, peace of mind, and overall well-being.

112.    Upon learning that the air around her home has been contaminated with EtO for decades, Ms. Garcia Rivera now lives in a state of fear and uncertainty. What was once her place of comfort and security has become a constant source of anxiety. Her ability to enjoy her own property has been substantially diminished, as she can no longer use or inhabit her home without concern that doing so places her health at continued risk. The only way to abate this nuisance is for Defendants to cease the emission of EtO into the surrounding community, including the air Ms. Garcia Rivera breathes in and around her home.

113.    Steri-Tech directly operated the facility that emitted EtO into the surrounding community, including the air at and around Plaintiff's residence. Balchem, in turn, played an active and substantial role in perpetuating the nuisance by providing product stewardship trainings and guidance on the handling of EtO to Steri-Tech employees. These trainings were not incidental— they helped shape operational conduct and reinforced handling practices that contributed to harmful emissions.

114.    The cost of these harms has been unreasonably borne by Plaintiff, who has suffered, and continues to suffer, losses by having to pay the cost to abate these risks to her health and property.

115.    Defendants' conduct was a substantial factor in causing Plaintiff to have to incur these costs and suffer these damages.

116.    The Defendants knew with substantial certainty that their acts and/or omissions regarding the release of EtO would have a detrimental effect on the health of Ms. Garcia Rivera and the potential enjoyment of her property.

117.    As a result of the private nuisance caused by Defendants, Plaintiff has suffered physical and emotional injury, medical expenses, property damage, and a reduced quality of life.

**COUNT III**
**Abnormally Dangerous Activity**
**Against Each Defendant Individually and Collectively**

118.    Plaintiff incorporates allegations in paragraphs 1-99 as if fully set forth herein.

119.    EtO is abnormally dangerous because of the highly toxic and volatile nature of the substance, the existence of a high degree of risk of some harm to others the EtO poses, the likelihood that the harm that results from it will be significant, the inability to utilize the substance as Defendants have without producing unsafe levels of emissions, the location of the plant in a densely populated area, and the comparative lack of economic value the facility to the community.

120.    The manufacturing, distribution, storage, use, and emission of EtO from the Facility constitute one or more abnormally dangerous activities, resulting in strict liability, as defined by the Second Restatement of Torts. See Restatement (2d.) § 519.

121.    The doctrine of strict products liability in Puerto Rico is considered a "jurisprudential embellishment" by the Supreme Court of Puerto Rico of the basic statutory tort action contained in Article 1802 of the Puerto Rico Civil Code.

122.    As this Court has stated previous, "[i]n order to fill a gap in our body of laws, the Puerto Rico Supreme Court [has] adopted, through case law, the U.S. common law products

liability principles ... to develop this field ... notwithstanding the fact that our legal system is rooted in the Civil Law that puts emphasis on positive or written law." *Gonzalez Caban v. JR Seafood*, 132 F. Supp. 3d 274, 280 (D.P.R. 2015), *certified question answered*, 199 D.P.R. 234, 2017 TSPR 187, 99 P.R. Offic. Trans. 15 (Dec. 1, 2017) (citation modified).

123.    The same reasoning applies to Strict Liability claims concerning Abnormally Dangerous Activities, as articulated in the Second Restatement of Torts, particularly when they stem from product liability situations.

124.    These EtO emissions posed a significant risk to those who live, attend school, pray, and work in the surrounding area. Further, the likelihood of cancer caused by the Defendants' use and emission of EtO in 2022 alone is as much as 600 times the maximum acceptable risk level based on recent EPA testing, and likely many times that maximum acceptable risk level before the 1990s.

125.    EtO is especially inappropriate given the area in which the facility is located, within a densely populated residential area and among schools, municipal buildings, churches, and parks.

126.    While the activities conducted by Defendants are exceedingly dangerous, they offer comparatively little value to the surrounding community.

127.    Because the alleged EtO-related activities of Defendants are abnormally dangerous, they are strictly liable for any injuries proximately resulting therefrom.

128.    As a direct and proximate result of Defendants' abnormally dangerous actions regarding EtO, Plaintiff has been exposed to a dangerous amount of EtO while living in the impacted community.

129.     As a direct and proximate result of Plaintiff's inhalation of EtO emissions from the Facility, she developed the herein alleged injuries, which have caused and will continue to cause Plaintiff to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, and a loss of their normal life.

130.     Plaintiff respectfully request that judgment be entered in her favor and against Defendants in an amount to be determined by the jury at trial.

**COUNT IV**
**Failure to Warn or Instruct**
**Article 1802 of the Puerto Rico Civil Code (31 L.P.R.A. § 5141)**
**Against Balchem Corp.**

131.     Plaintiff incorporates allegations in paragraphs 1-99 as if fully set forth herein.

132.     Balchem Corp. manufactured, distributed, marketed, promoted, and sold EtO for use in commercial sterilization processes at the Facility operated by Steri-Tech, Inc. Balchem knew, or should have known, that EtO is a toxic and carcinogenic substance whose use in sterilization facilities poses substantial risks to public health, especially from fugitive emissions.

133.     Balchem manufactured and distributed EtO to Steri-Tech and provided product literature, guidance materials and product stewardship training on the handling of EtO to industrial users. In doing so, it had a duty to provide adequate warnings and instructions—not only regarding the hazards of EtO during use but also regarding the risks posed by emissions to surrounding communities and the necessary precautions to mitigate those risks.

134.     Balchem failed to fulfill this duty in multiple respects. First, the safety data sheets (SDS) and label warnings provided by Balchem with its EtO products failed to adequately disclose the environmental and community health risks posed by fugitive EtO emissions. These materials did not warn industrial end users—often workers with limited educational background or technical preparation—that routine operations involving EtO could result in offsite migration and exposure

to surrounding residential areas, nor did they include instructions for preventing or mitigating such emissions.

135.     Balchem could have lawfully updated its labeling to include clear emission mitigation instructions—such as warnings against venting EtO directly to the outside or requiring scrubber systems—through minor modifications under 40 C.F.R. § 152.46, without prior EPA approval. These changes would have enhanced safety by meeting the regulatory requirement that directions for use protect against personal injury and unreasonable adverse environmental effects. See 40 C.F.R. § 156.10(i).

136.     Second, Balchem failed to use its "product stewardship programs" and training materials to warn or instruct industrial users, including Steri-Tech employees, about the risks their EtO operations posed to nearby communities. Despite providing training and support regarding EtO handling, Balchem omitted essential guidance on emission controls and failed to emphasize the foreseeable consequences of inadequate safeguards on public health and the surrounding environment.

137.     Moreover, FIFRA does not preempt supplemental warnings provided through product stewardship programs, SDS, signage, or community outreach—each of which Balchem could have used to inform industrial users and protect nearby residents. See *Bates v. Dow Agrosciences*, 544 U.S. 431, 444 n.17 (2005).

138.     Balchem knew that the EtO it manufactured, distributed and supplied to Steri-Tech would be used in sterilization processes that generate fugitive emissions, and that improper handling, inadequate controls, or insufficient user awareness could result in toxic EtO entering the surrounding air. Despite this, Balchem failed to warn or instruct end users—Steri-Tech employees——on how to prevent these foreseeable emissions.

139.    Balchem provided training to Steri-Tech employees on EtO handling. That training failed to address the health risks EtO emissions posed to the surrounding community or include sufficient instruction on mitigation practices to protect nearby residents. The lack of adequate warnings and training focused on emissions contributed to the unsafe release of EtO into the environment.

140.    The EtO manufactured, distributed and supplied by Balchem was used at the Steri-Tech Facility and reached Plaintiff's property without substantial change in condition from when it left Balchem's control. The resulting exposure to airborne EtO caused Plaintiff's injuries, including but not limited to her breast cancer diagnosis and ongoing physical and economic harm.

141.    Balchem is strictly liable for the harm caused by its failure to provide adequate warnings and instructions concerning the foreseeable environmental dangers of EtO, particularly those affecting the surrounding community. The risks associated with fugitive EtO emissions were foreseeable and preventable had Balchem fulfilled its duty to warn adequately and instruct industrial users.

142.    Plaintiff has suffered and continues to suffer injury due to the failure of Balchem to provide adequate warnings and instructions, which contributed directly and foreseeably to the emission of EtO from the Steri-Tech facility and the resulting contamination of Plaintiff's environment.

**COUNT V**
**Design Defect**
**Against Balchem Corp.**

143.    Plaintiff incorporates allegations in paragraphs 1-99 as if fully set forth herein.

144.    Balchem's manufacture, sales, and distribution of sterilant products to Defendant Steri-Tech constituted an unreasonably and inherently dangerous design of such products in that

they contained exclusively or primarily EtO without adequate available alteration(s) to improve the safety of the product.

145.    The omission, for example, of the safety mechanism of added odorant to the sterilant products renders them needlessly and therefore unreasonably dangerous.

146.    For example, the natural gas supplied by public utilities (chiefly methane), has been odorized by law for decades. Following tragedies like the 1937 New London school explosion—caused by an odorless gas leak—regulations were enacted to require odorants in consumer gas. Under 49 C.F.R. §192.625, "a combustible gas in a distribution line" (i.e. gas delivered through pipelines to end users) must be odorized so that leaks are detectable at 20% of the gas's lower explosive limit. State laws and utility codes uniformly mirror this mandate. As a result, virtually all natural gas distributed to homes or businesses in the U.S. has a distinctive sulfur-like odor (from mercaptan additives) as a built-in safety warning. The rationale is straightforward: adding a chemical odorant to gas allows people to detect potential danger from that compound's presence.

147.    The obligation to odorize hazardous gases is not unique to the United States; it is reflected in the laws and standards of many other countries, underscoring that odorization is the global baseline safety practice for hazardous gases. Odorless combustible and ultrahazardous gas are viewed as unacceptably dangerous when there is a risk to residential populations.

148.    Pure ethylene oxide is an odorless gas at room temperature; it has only a faint ether-like smell when present at concentrations considered only possible in scarce accidental occupational exposure settings. Employees or occupants generally cannot rely on their sense of smell to warn them of an EtO leak, the way they can for a propane or natural gas leak. In effect, unodorized EtO is an unjustifiable outlier that fails to incorporate the standard safety feature (a

smell) that is required in other highly explosive and otherwise hazardous gases to alert humans of danger.

149.    Given the longstanding consensus reflected in statutes, regulations, and industry practice that adding odorants is the minimum standard for safety when handling hazardous and combustible gases, the absence of any odorant in Balchem's EtO-based sterilant products is a glaring safety gap and a product defect. By supplying EtO in an odorless form for intended use by Steri-Tech, Balchem provided a product that lacks a standard safety safeguard, a feature typically found in less hazardous chemical gas products. Residents surrounding facilities that use such gases are part of the group intended to be protected by added odorants, and Plaintiff falls within that group.

150.    The failure to odorize EtO deprived downstream users and exposed community members, including Plaintiff, of the last clear chance to avoid or reduce harm, a protection that is mandated for other gases which present fewer recurrent chronic health risks.

151.    The risks and dangers inherent in the design of Balchem's sterilant products significantly outweigh any perceived benefits of the design of such products when they are put to reasonably foreseeable uses.

152.    Balchem knew their sterilant products were unsafe to an extent that an ordinary person cannot contemplate the health risk associated with odorless EtO emissions in populated communities, such as Salinas, because their exposure is necessarily not detectable as designed.

153.    Any benefit to the current design of the sterilant products fails to outweigh the inherent risks. Practical and feasible alternative designs for sterilant products capable of reducing Plaintiff's injuries, damages, and financial losses.

154.    Balchem could have chosen a basic precautionary measure of adding an odor to the sterilant products that would alert employees and residents in the vicinity of the appreciable levels of toxic EtO emissions present in the air they were breathing.

155.    The EtO reached Plaintiff's property and community without their knowledge and any substantial change in condition from when they were under Balchem's control.

156.    Plaintiff has suffered, is suffering, and will continue to suffer into the indeterminable future because of intentional design determinations by Balchem, which have resulted in unreasonably dangerous sterilant products—exposure to which is entirely undetectable to Plaintiff and community members.

157.    Balchem is strictly liable for all damages arising from its defectively designed sterilant products, in an amount to be proven at trial, in excess of $75,000.00.

158.    In the alternative to the strict liability theory outlined above, Balchem owed a duty of reasonable care to protect Plaintiff against the unreasonable health and safety risks resulting from their EtO-containing products.

159.    Defendants failed to exercise ordinary care because reasonably careful companies would have used basic precautionary measures, such as adding a readily detectable odor to EtO products destined to be air emissions, that would have alerted residents in the vicinity to the toxic EtO emissions present in the air they were breathing.

160.    Balchem's unreasonable design decision(s) for their sterilant products have and continue to cause injury and damage to the health and well-being of Plaintiff.

**COUNT VI**
**Violation of the Clean Air Act 42 U.S.C. § 7604**
**Against Defendant Steri-Tech, Inc.**

161.    Plaintiff incorporates allegations in paragraphs 1-99 as if fully set forth herein.

162. The Clean Air Act ("CAA") provides for a private right of action under 42 U.S.C. § 7604, giving Plaintiff standing to bring this claim.

163. Defendant Steri-Tech operates a commercial sterilization facility that emits EtO, a hazardous air pollutant regulated under the CAA, 42 U.S.C. § 7401 et seq., and subject to the National Emission Standards for Hazardous Air Pollutants (NESHAP) for Sterilization Facilities under 40 C.F.R. Part 63, Subpart O.

164. The CAA and the regulations promulgated thereunder require Steri-Tech to limit and control EtO emissions from its facility to protect public health and the environment.

165. Defendant Steri-Tech has violated, and continues to violate, the CAA by failing to comply with the following regulatory requirements:

   a. Failing to maintain the required minimum operating temperatures of 1,521°F for its thermal oxidizer to ensure a 99% destruction efficiency of EtO, as required by 40 C.F.R. § 63.362(c), 63.363(a)(1), and 63.363(b)(3), and Section 112 of the CAA. EPA inspections revealed oxidizer temperatures consistently below the required threshold, allowing excessive EtO emissions.

   b. Failing to comply with continuous monitoring and reporting requirements for the thermal oxidizer as mandated by 40 C.F.R. §§ 63.363(f), 63.364(c), and Section 112 of the CAA. Defendant did not install or maintain appropriate monitoring equipment, resulting in inaccurate reporting of EtO emissions and failure to demonstrate ongoing compliance with emission standards.

   c. Failing to ensure that the newly installed Catalytic Recuperative Oxidizer (CRO) meets the 99.9% EtO destruction efficiency standard, in violation of both NESHAP requirements and the facility's operating permit. The CRO has experienced multiple operational failures, including explosions caused by exceeding EtO concentration limits.

166. As a result of Defendant's ongoing violations of the CAA, Steri-Tech has released significant amounts of EtO into the atmosphere, contributing to elevated cancer risks, environmental degradation, and public health hazards for the surrounding communities.

167. The violations identified herein constitute a "failure to comply with an emission standard or limitation" as defined in 42 U.S.C. § 7604(f) and give rise to a citizen suit under 42 U.S.C. § 7604(a), allowing for the imposition of civil penalties and injunctive relief.

### Declaratory Judgment

168. Plaintiff incorporates allegations in paragraphs 1-99 as if fully set forth herein.

169. Plaintiffs seek a declaration pursuant to 28 U.S.C. §§ 2201-2202.

170. There exists an actual, substantial, and immediate controversy warranting this Court's declaration of the responsibilities of Defendants for the costs incurred and to be incurred by Plaintiff as a result of Defendants' failure to take all reasonable measures to ensure EtO would not be released into the environment and inevitably injure Plaintiff.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Sheila M. Garcia Rivera, respectfully requests that this Court enter judgment in her favor and against Defendants, jointly and severally, as follows:

1. Compensatory damages, including medical expenses, pain and suffering, emotional distress;

2. Punitive damages to punish and deter Defendants' willful, wanton, or reckless negligence and conduct;

3. Costs for medical monitoring due to the increased risk of future health complications;

4. Injunctive relief;

5. Declaratory judgment;

6. Attorneys' fees and costs as permitted by law;

7. Pre-judgment and post-judgment interest; and

8. Such other and further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully Submitted: June 12th, 2025

*/s/ Luis V. Almeida-Olivieri*
Luis V. Almeida-Olivieri (PR Bar #308307)
Melissa K. Sims (*pro hac vice forthcoming*)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, LLC**
1311 Ponce de Leon Ave. Suite 700
San Juan, PR, 00907
Tel: (516) 741-5600
Fax: (516) 741-0128
lalmeida@milberg.com
msims@milberg.com

*-and-*

John Fonda (*pro hac vice forthcoming*)
**NAPOLI SHKOLNIK PLLC**
360 Lexington Avenue, Eleventh Floor,
New York, NY 10017
Tel: (212) 397-1000 |
jfonda@napolilaw.com

*-and-*

Ari Kresch
(PR Bar #309614)
**Kresch Legal Services PR, PLLC**
1225 Avenida Ponce de Leon, Suite 605
San Juan, Puerto Rico 00907
Tel: (800) 529-3476
akresch@1800lawfirm.com

*Counsel for Plaintiff*