**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **SHEILA M. GARCIA RIVERA** | |
| Plaintiff, | **CASE NO. 3:25-cv-01056-CVR** |
| v. | |
| **BALCHEM CORP.,** and **STERI-TECH, INC.** | |
| Defendants. | **JURY TRIAL DEMANDED** |

**PLAINTIFF'S OPPOSITION TO BALCHEM'S MOTION TO DISMISS
AMENDED COMPLAINT (ECF NO. 38)**

## TABLE OF CONTENTS

I.  INTRODUCTION ………………………………………………………………… 1

II.  PROCEDURAL POSTURE………………………………………………………  2

III. STANDARD OF REVIEW ……………………………………………………  2

VI. ARGUMENT…………………………………………………………………  3

    A. PLAINTIFF SURVIVES BALCHEM'S STATUTE OF LIMITATIONS ATTACK UNDER THE CONTINUING TORT DOCTRINE……………………………………..  4

    B. BALCHEMS' ADVOCACY FOR THE ETO INDUSTRY IS A SMOKESCREEN WHICH AIMS TO DISTRACT FROM THE CONSEQUENCES OF THEIR ACTIONS…………………………………………………………………  5

    C. PLAINTIFF HAS ADEQUATELY PLED A DESIGN DEFECT CLAIM………………  7

        1.  Plaintiff's Design Defect Claim Is Properly Grounded in Puerto Rico Law……..  8

            a.  Plaintiff Presented a Prima Facie Design Defect Claim under the Risk-Utility Test………………………………………………………………..  9

    D. PLAINTIFF HAS ADEQUATELY PLED A FAILURE TO WARN CLAIM…………..  12

        1.  Puerto Rico Law Recognizes a Duty to Warn Risk to Foreseeable Bystanders….  12

        2.  Balchem's Warnings Ignored the Foreseeable Risk of Fugitive EtO Emissions…  13

        3.  EPA Label Approval Does Not Immunize Balchem from Liability……………...  14

        4.  Federal Law Expressly Authorizes Additional Protective Warnings……………  15

        5.  OSHA Employer Duties Do Not Extinguish Balchem's Independent Duty to Warn………………………………………………………………………  16

    E. PLAINTIFF'S NEGLIGENCE CLAIM IS VIABLE AND SUPPORTED BY PUERTO RICO LAW……………………………………………………………………  17

        1.  Balchem Assumed a Duty Through Its Own Training and Product Stewardship...  17

    F.  PLAINTIFF'S PRIVATE NUISANCE CLAIM IS VIABLE AGAINST BALCHEM….  20

1.   Conduct, Not Ownership, Determines Nuisance Liability in Puerto Rico………. 20

2.   Balchem's Trainings Embedded Unsafe Practices That Perpetuate the Nuisance. 21

G. PLAINTIFF'S ABNORMALLY DANGEROUS ACTIVITY CLAIM IS VIABLE AS A MATTER OF LAW……………………………………………………………... 22

V.  CONCLUSION…………………………………………………………………… 25

VI  CERTIFICATE OF SERVICE …………………………………………………… 27

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*Álvarez-Cabrera v. Toyota Motor Sales*, U.S.A., Inc., 2020 WL 3620204 (D.P.R. July 2, 2020)…………………………………………………………………………………… 8, 8–9

*Ahrens v. Superior Ct.*, 197 Cal. App. 3d 1134 (Ct. App. 1988)………........................ 23

*Aponte Rivera v. Sears Roebuck*, 144 D.P.R. 830 (1998), 44 P.R. Offic. Trans. 39…….. 9, 12, 13

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)……………………………….................... 3

*Barker v. Lull Eng'g. Co.*, 20 Cal. 3d 413, 143 Cal. Rptr. 225, 573 P.2d 443 (1978)…..... 9

*Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005)……………….................... 14, 14–15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)……………………….................... 2, 3

*Berezin v. Regency Sav. Bank*, 234 F.3d 68 (1st Cir. 2000)………........................ 2

*Betancourt Ruiz v. Toyota Motor Corp.*, No. 04-1782 (SEC), 2007 WL 9760418 (D.P.R., May 8, 2007)……………..................................................................... 8

*Block v. Neal*, 460 U.S. 289 (1983)……………………………………………… 19

*Blum v. Holder*, 744 F.3d 790, 795 (1st Cir. 2014)............................................... 2

*Caraballo-Rodríguez v. Clark Equip. Co.*, 147 F. Supp. 2d 66 (D.P.R. 2001)…............. 8

*Capella v. Carreras*, 57 D.P.R. 258 (1940), 1940 WL 7908……………................. 4

*City of Philadelphia v. Lead Indus. Ass'n*, Inc., No. 90-7064, 1992 WL 98482 (E.D. Pa. Apr. 23, 1992)……………………………………………………………….... 10

*Collazo-Santiago v. Toyota Motor Corp.*, 149 F.3d 23 (1st Cir. 1998)……................. 9, 10, 23

*Cruz-Vargas v. R.J. Reynolds Tobacco Co.*, 348 F.3d 271 (1st Cir. 2003)…………....... 12

*Edwards v. Post Transp. Co.*, 228 Cal. App. 3d 980, 279 Cal. Rptr. 231 (Ct. App. 1991)............................................................................................ 23

*González Cabán v. JR Seafood, Inc.*, 132 F. Supp. 3d 274 (D.P.R. 2015)…....................... 22

*García Colón v. García Rinaldi*, 340 F. Supp. 2d 113 (D.P.R. 2004)………………..... 18–19

*García v. Hartford Fin. Servs. Grp., Inc.*, No. 18-2013 (JAG), 2022 WL 2836272 (D.P.R. June 1, 2022)……………………………………………………………………... 8

*In re Nat'l Prescription Opiate Litig.*, 589 F. Supp. 3d 790 (N.D. Ohio 2022)………….. 21

*Jiménez-Ruiz v. Spirit Airlines, Inc.*, 794 F. Supp. 2d 344 (D.P.R. 2011)………………. 18, 19

*López-Rivera v. Hosp. Auxilio Mutuo, Inc.*, 290 F. Supp. 3d 137 (D.P.R. 2017)………... 3

*M.R. (Vega Alta), Inc. v. Caribe Gen. Elec. Prods., Inc.*, 31 F. Supp. 2d 226 (D.P.R. 1998)…………………………………………………………………………………… 4, 5

*Miller v. Louthan*, No. 22-01538 (MAJ), 2024 WL 1230255 (D.P.R. Mar. 22, 2024)....... 3

*Muñiz-Rivera v. United States*, 204 F. Supp. 2d 305 (D.P.R. 2002), aff'd, 326 F.3d 8 (1st Cir. 2003)………………………….............................................................................. 19, 20

*Quintana-Ruiz v. Hyundai Motor Corp.*, 303 F.3d 62 (1st Cir. 2002)……………………. 9, 9–10

*Raymond v. Eli Lilly & Co.*, 412 F. Supp. 1392 (D.N.H. 1976)………………………….. 3

*Ríos Mártir v. Municipality of San Sebastián*, 106 D.P.R. 172 (1977), 6 P.R. Offic. Trans. 240……………………………………………………………………................ 20

*Rivera Ruíz v. Mun. de Ponce*, 196 D.P.R. 410 (2016)…………………………………... 4

*Rivera-Santana v. Superior Packaging, Inc.*, 132 D.P.R. 115 (1992), 1992 P.R.-Eng. 754, 830…........................................................................................................................ 8, 9

*Town of Princeton v. Monsanto Co.*, 202 F. Supp. 3d 181 (D. Mass. 2016)…................. 3

*Vázquez-Filippetti v. Banco Popular de P.R.*, 504 F.3d 43 (1st Cir. 2007)………………. 8

## STATUTES AND RULES

7 U.S.C. § 136v(b)……………………………………………….......................... 14

28 U.S.C. § 2680…………………………….................................................... 19

42 U.S.C. § 11002…………………….................................….    22

42 U.S.C. § 7412(r)(3)........................................................    22

## **REGULATIONS**

29 C.F.R. § 1910.1047(j)…………………………………......    16

40 C.F.R. § 68.130........................................................    22

40 C.F.R. § 152.46…………………...……………………..    15

49 C.F.R. § 192.625……………………………………….....    11

## **OTHER AUTHORITIES**

Fed. R. Civ. P. 8(a)………………………………………........    2

Fed. R. Civ. P. 12(b)(6)……………………………………..    2, 3, 4

Restatement (Second) of Torts § 323………………………………………    16

Restatement (Second) of Torts § 324A………………………………………    16

Restatement (Second) of Torts § 519………………………………………..    23

Restatement (Second) of Torts § 520………………………………………..    23, 25

Restatement (Second) of Torts § 821A …………………………………………..    21

Restatement (Second) of Torts § 834 cmt. E……………………………………..    21

# I.    INTRODUCTION

For decades, Balchem Corporation ("Balchem") produced and supplied an antimicrobial sterilant—ethylene oxide ("EtO")—to a large-scale commercial sterilization facility located in the La Margarita Community of Salinas, Puerto Rico. EtO is carcinogenic, mutagenic, highly flammable, and explosive, thereby rendering it ultra-hazardous. To reduce some of these risks—specifically, its propensity to explode and its toxicity to workers inside the Salinas Facility—Balchem instructed Steri-Tech to vent the gas into the air to lower the ambient levels of EtO within the Facility. Following these instructions, the Steri-Tech workers regularly discharged EtO into the air outside the Facility—including by leaving open windows near the sterilization gas chambers. These intentional discharges, among others, have unjustly exposed the densely populated residential community around the Facility to EtO. This exposure has been virtually undetectable, given the colorless and odorless nature of the emissions from Balchem's product used by Steri-Tech. Plaintiff Sheila M. Garcia Rivera, along with others in the community, was involuntarily exposed to EtO for much of her life without any warning from Balchem that each breath she took increased her exposure (and thus her dose), raising her risk of developing several types of cancer and other serious illnesses. Ms. Garcia Rivera has developed breast cancer as a result of this unjust exposure to Balchem's abnormally dangerous product—and she now seeks accountability.

In an effort to dodge liability for cancer caused by environmental exposure to the carcinogen it manufactured, supplied, and trained facility staff in the "safe" use of, Balchem asserts several arguments—all of which are ultimately unsupported by Puerto Rico law. Accordingly, Plaintiff, Sheila M. Garcia Rivera, through undersigned counsel, states as follows in opposition to Defendant Balchem Corp's Motion to Dismiss Plaintiff's Amended Complaint.

## II.    PROCEDURAL POSTURE

On January 31, 2025, Plaintiff filed the original Complaint in the above-captioned action against Defendants Balchem Corp. (Balchem), Steri-Tech, Inc. (Steri-Tech) and Mays Chemical Company of Puerto Rico, Inc. (Mays). ECF No. 1. After Defendants filed motions to dismiss and for joinder, on June 12, 2025, Plaintiff filed her First Amended Complaint, asserting claims against Defendants Balchem and Steri-Tech ("Am .Compl."). ECF No. 33.[1] As a result, the Court denied without prejudice Defendants' prior motions to dismiss and motion for joinder. ECF No. 34. Defendants subsequently requested, and were granted, two extensions of time to respond to the Amended Complaint. ECF Nos. 35, 36, 37, 39. On July 21, 2025, Balchem filed a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6). ECF No. 38. On July 24, 2025, Defendant Steri-Tech, Inc. filed its own Motion to Dismiss, ECF No. 40, as well as a Motion for Joinder to Balchem's Motion, ECF No. 41. Plaintiff hereby submits her Opposition to the Motion to Dismiss filed by Balchem. ECF No. 38.

## III.    STANDARD OF REVIEW

A complaint need only be a "short and plain statement of the claim showing that the pleader is entitled to relief," a standard Plaintiff has easily satisfied. Fed. R. Civ. P. 8(a)(2). "[D]etailed factual allegations" are not required. See, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Blum v. Holder*, 744 F.3d 790, 795 (1st Cir. 2014) (In reviewing a motion to dismiss, the Court "accept[s] as true all material allegations in the complaint."). The Court must construe the complaint liberally and draw all reasonable inferences in favor of the plaintiff. See, *Berezin v. Regency Sav. Bank*, 234 F.3d 68, 70

---

[1] The Amended Complaint did not assert claims against previously named defendant Mays, effectively dismissing Mays from this action.

(1st Cir. 2000). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (noting the facial plausibility standard "is not akin to a 'probability requirement'").

Nuances have developed since *Iqbal/Twombly*, and "the test is somewhat different for 12(b)(6) motions based on a statute of limitations defense. The Court may grant a motion to dismiss on a limitations defense only if the facts, so derived and viewed in the requisite perspective, leave no doubt that an asserted claim is time-barred." *Miller v. Louthan*, No. 22-01538 (MAJ), 2024 WL 1230255 (D.P.R. Mar. 22, 2024) (citing *López-Rivera v. Hosp. Auxilio Mutuo, Inc.*, 290 F. Supp. 3d 137, 141 (D.P.R. 2017)); see also *Town of Princeton v. Monsanto Co.*, 202 F. Supp. 3d 181, 195 (D. Mass. 2016) (applying discovery rule where PCB contamination and its source were not reasonably knowable without testing); *Raymond v. Eli Lilly & Co.*, 412 F. Supp. 1392, 1401 (D.N.H. 1976) (applying discovery rule where link between beryllium poisoning and defendant's conduct was inherently unknowable for years). Per these standards, the elements of tort liability for negligence, public and private nuisance, unjust enrichment, medical monitoring, defective design, and failure to warn have been sufficiently pleaded and supported with relevant facts and should survive dismissal.

## IV.    ARGUMENT

Balchem's motion fails because it disregards both the pleading standard and the breadth of Puerto Rico tort law. The Amended Complaint alleges that Balchem manufactured and supplied EtO for use in a residential community, trained facility workers in its supposed "safe" use, designed and marketed EtO without feasible safety features such as odorants, and failed to warn of the foreseeable risks of fugitive emissions. These allegations support claims for negligence, design

defect, failure to warn, nuisance, and abnormally dangerous activity. Balchem's defenses—limitations, EPA preemption, and the assertion that it did not "operate" the facility—are inconsistent with controlling law. At this stage, Plaintiff needs only to plausibly allege facts supporting each element, which she has done by pleading ongoing exposure, concrete injury, and direct misconduct by Balchem itself. That is more than sufficient to defeat dismissal under Rule 12(b)(6).

## A. PLAINTIFF SURVIVES BALCHEM'S STATUTE OF LIMITATIONS ATTACK UNDER THE CONTINUING TORT DOCTRINE.

Because the Facility continues to emit dangerous volumes of EtO, and because Plaintiff continues to be exposed to those emissions, she is empowered by the continuing tort doctrine for purposes of tolling the statute of limitations. Under Puerto Rico law, "[a]n accrual date may be delayed if a plaintiff has suffered a continuing tort or a continuing violation. A continuing violation occurs when there is a series of continual unlawful acts[.]" *Muniz-Rivera v. United States*, 204 F. Supp. 2d 305, 315 (D.P.R. 2002), aff'd, 326 F. 3d 8 (1st Cir. 2003).

The "continuing tort doctrine" was first adopted by the Puerto Rico Supreme Court in *Capella v. Carreras*, 57 D.P.R. 258, 266 (1940), 1940 WL 7908, a public nuisance case. Since then, the Court has discussed its applicability on multiple occasions. Most recently, on *Rivera Ruiz v. Mun. de Ponce*, 196 D.P.R. 410 (2016), after extensively analyzing its prior pronouncements, modern precedents in other jurisdictions and recent treatises the Court concluded that under the continuing tort doctrine**,** the statute of limitations is tolled until "the last acts or omissions are verified, or the final result occurs, <u>whichever is later</u>" *Id*. at 426 (emphasis added). The Court further stated that this doctrine is not just applicable to nuisance and domestic violence cases, but applies to all tort causes of action arising from continued acts or omissions. *Id*. at 427. In *M.R. (Vega Alta), Inc. v. Caribe General Elec. Products, Inc.*, the Puerto Rico District Court, while

providing an example of what would qualify as a continuing tort, pointed out that "[f]or there to be a continuous tort, Defendants must be continuously acting, i.e., continuing to dump pollutants on Plaintiffs' land." 31 F. Supp. 2d 226, 240 (D.P.R. 1998). Here, Defendants continue to emit carcinogens in the air that Plaintiff and her neighbors breathe. Accordingly, the continuous tort doctrine applies.

Plaintiff alleges that Defendants actions have been continuous: "At all relevant times, toxic ethylene oxide (EtO) fumes were emitted from the Facility, contaminating the air in surrounding communities, including Salinas" Am. Comp. ¶90;  "Ms. Garcia Rivera's exposure is continuing and ongoing, which has exacerbated her injuries and placed her at an increased risk of developing other injuries scientifically linked to EtO exposure". Am. Comp. ¶92. Plaintiff also alleges that she continues to be exposed to the emissions: "Plaintiff [...] has continuously resided within the toxic emissions exposure zone of the Facility–initially within 1000 feet from 1986 to 2012, and subsequently within one mile from 2012 to the present". Am. Comp. ¶4. Balchem continues to manufacture and distribute EtO to Steri-Tech's facility and provide training to its employees through its product stewardship training, asserting no argument to the contrary in their lengthy effort to dismiss this action. These material allegations, necessarily taken as true under our federal pleading standard, establish that Defendants have engaged in a continued and ongoing pattern of unlawful acts or omissions.

## B. BALCHEMS' ADVOCACY FOR THE ETO INDUSTRY IS A SMOKESCREEN WHICH AIMS TO DISTRACT FROM THE CONSEQUENCES OF THEIR ACTIONS.

Balchem prefaces its arguments by arguing that EtO is a highly regulated, EPA-approved, and labeled medical sterilant critical to public health, and emphasizes that its product labeling complies fully with federal and state regulatory requirements. See, ECF No. 38 at 2–3. These

assertions have nothing to do with the claims in this case. Though Defendant attempts to camouflage itself as a steward of public health, it ignores its critical role in fueling an ongoing public health crisis across Puerto Rico and the United States.[2] Its focus on the general importance of EtO to the medical industry at large is meant to deflect attention from its glaring failures in this case: supplying an odorless highly-explosive carcinogen without adequate design safeguards, failing to warn the surrounding community or adequately inform users of the consequences of improper emissions control, and playing an active role in facility operations through "product stewardship training" that contributed to the very misconduct at issue. Public health and environmental justice concerns weigh heavily against Balchem's position, rather than in its favor.

Similar obfuscation underlies Balchem's claim that EtO sterilization is critical to health infrastructure and that there are no viable alternatives for the sterilization of <u>certain</u> medical devices. See, ECF. No. 38 at 5. This is true for a non-zero number of medical devices in commerce. However, Balchem never explains 1. How many such devices exist, or 2. whether the facility at issue here actually sterilizes any of them. Nor does it identify a single product processed at Steri-Tech that cannot be sterilized using one of the FDA-approved alternatives. See, Am. Compl. ¶ 96-

---

[2] As discussed by the Union of Concerned Scientists:

> The commonwealth of Puerto Rico bears a disproportionate burden of EtO pollution from commercial sterilizers. Only California and Texas, the two most populous states, have more sterilizers, even though Puerto Rico has roughly one-tenth the population of Texas and 1 percent of its land area.
> . . .
> The sterilizers in Añasco and Salinas have the highest excess cancer risk levels from EtO emissions (5,000 and 6,000 cases per 1 million, respectively) among all 23 elevated-risk sterilizers identified by the EPA. . . . EtO emissions account for 96 and 91 percent of the overall cancer risk in these respective census tracts[.]

Union of Concerned Scientists, *Puerto Rico* (July 12, 2022), https://www.ucs.org/resources/puerto-rico.

98.[3] Without that basic information, the Court cannot assess whether this argument is relevant to this case—and Plaintiff asserts that it is not. Balchem has not argued that Steri-Tech sterilized any of the specific devices that require EtO—only that a non-zero amount of medical devices in the us do not have an alternative. Balchem's gross overstatements and immaterial comments on the global EtO industry ought to be disregarded because they do nothing to absolve them of liability in this matter.

### C. PLAINTIFF HAS ADEQUATELY PLED A DESIGN DEFECT CLAIM

On its Motion to Dismiss, Balchem argues that Plaintiff's Design Defect claim (Count V) against it should be dismissed because: (a) their product "cannot be redesigned", ECF No. 38, at 9, (b) Plaintiff "did not identify a specific defect", *Id*. at 9, (c) the addition of an odorant is "not feasible", *Id*. at 10–11) and (d) Plaintiff did not "plausibly allege that design defects in EtO could have proximately caused [her] injuries", *Id*. at 11–12. Query, first, how Plaintiff could both identify that failure to add an odorant is a defect, which Balchem views as a "non-feasible" addition, while failing to "identify a specific defect."

Each of these arguments fails. As explained below, Plaintiff has identified a specific defect, alleged facts showing that the product, as designed and distributed, was unreasonably dangerous, and pled a feasible alternative design supported by science and industry practice. Whether the addition of an odorant is ultimately feasible or whether the defect caused Plaintiff's injuries are fact questions necessitating the benefits of expert discovery that cannot be resolved at this stage. Balchem's motion seeks to impose a burden of proof that does not apply at the pleading stage and should be rejected.

---

[3] Considering the health risks associated with EtO, the FDA has actively promoted and approved several alternative sterilization methods (i.e. Hydrogen Peroxide Gas Plasma, Gamma Radiation, Electron Beam (E-Beam) Radiation, Steam Sterilization (Autoclaving), Vaporized Hydrogen Peroxide (VHP), Peracetic Acid, Dry Heat Sterilization and Supercritical Carbon Dioxide (SCCO2)).

### 1.  Plaintiff's Design Defect Claim Is Properly Grounded in Puerto Rico Law.

A design defect has been defined as "[a]n imperfection occurring when the seller or distributor could have reduced or avoided a foreseeable risk of harm by adopting a reasonable alternative design, and when, as a result of not using the alternative, the product or property is not reasonably safe." *García v. Hartford Fin. Servs. Grp., Inc.*, No. CV 18-2013 (JAG), 2022 WL 2836272. (D.P.R. June 1, 2022). Under Puerto Rico law, a plaintiff prevails "in a case of a design defect if he proves that [...] 'the product's design proximately caused his injury and the defendant fails to establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design.'" *Rivera-Santana v. Superior Packaging, Inc.,* 132 D.P.R. 115, 129 (1992), 1992 P.R.-Eng. 754, 830. (emphasis added); *see also Carballo-Rodriguez v. Clark Equip. Co.*, 147 F. Supp. 2d 66, 72 (D.P.R. 2001) ("the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the . . . feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.") (citations omitted).

Two tests exist to establish a design defect claim: the "consumer-expectations test" and the "risk-utility test." *Caraballo-Rodríguez*, 147 F. Supp. 2d at 71.; *Vázquez-Filippetti v. Banco Popular de P.R.*, 504 F.3d 43, 52 (1st Cir. 2007). Under the consumer expectations test, a product is defective if it "failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." *Álvarez-Cabrera v. Toyota Motor Sales, U.S.A., Inc.*, 2020 WL 3620204, at *4 (D.P.R. July 2, 2020) (quoting *Betancourt Ruiz v. Toyota Motor Corp.*, 2007 WL 9760418, at *1 (D.P.R. 2007)).[4] Under the risk-utility test a Plaintiff must prove

---

[4] Because the "consumer-expectations" test does not apply in cases involving complex technical matters, Plaintiff limits her discussion to the "risk-utility" test, which is the appropriate standard for the design defect claim at issue.

that defendant's product's design proximately caused her injuries. The burden of proof then shifts to the defendant to show that the "benefits of the design at issue outweigh the risk of danger inherent in such a design." *Álvarez-Cabrera*, 2020 WL 3620204, at 4. "The risk-utility balancing test is designed to avoid converting the manufacturer into the insurer of every harm that arises out of a product from which the consumer derives utility." *Id*.

### a. Plaintiff Presented a Prima Facie Design Defect Claim under the Risk-Utility Test.

Balchem argues that under Puerto Rico's risk–utility test, Plaintiff must identify a feasible "redesign" of the product itself, and that where the proposed change would alter the nature of the product, no design defect claim is viable. Balchem contends that the "feasibility of a safer alternative design" is an "important part" of the analysis and that Plaintiff's allegation that 100% EtO is defective because it lacks an odorant fails as a matter of law. See, ECF No. 38 at 9. They argue that the absence of an odorant is not a "design" issue because the product "is EtO" and cannot be redesigned to omit EtO without ceasing to be EtO. See, *Id.*

This framing misstates Puerto Rico law, which does not impose "feasibility of an alternative design" as an element of the plaintiff's *prima facie* case, but instead treats it as one of several factors the defendant must establish in rebuttal. The Puerto Rico Supreme Court, following *Barker v. Lull Engineering Co.*, 20 Cal.3d 413, 143 Cal. Rptr. 225, 573 P.2d 443 (1978), has adopted a burden-shifting framework in design defect cases. *Aponte Rivera v. Sears Roebuck de P.R.*, 144 D.P.R. 830, 840 n.9 (1998), 44 P.R. Offic. Trans. 39; *Rivera–Santana v. Superior Packaging, Inc.*, 132 D.P.R. 115, 129–30 (1992); *Quintana–Ruiz v. Hyundai Motor Corp.*, 303 F.3d 62, 69 (1st Cir. 2002); *Collazo–Santiago v. Toyota Motor Corp.*, 149 F.3d 23, 26 (1st Cir. 1998). Under this rule, the plaintiff's initial burden is to show (1) that they were harmed, and (2) that the harm was proximately caused by the product's design. Once that showing is made, the

burden shifts to the defendant to prove, in light of the relevant factors (including feasibility of a safer alternative design) that the benefits of the design outweigh its risks. *Quintana–Ruiz*, 303 F.3d at 69; *Collazo–Santiago*, 149 F.3d at 26. Feasibility is thus one factor in the defendant's rebuttal case, not an element of the plaintiff's prima facie claim.

Ms. Garcia has met her initial burden by alleging that Balchem's design choice to market odorless EtO, Am. Compl. ¶¶ 58, 78, 145, a ultrahazardous sterilant and explosive whose emissions are undetectable to the ordinary person, *Id.* ¶¶90, 92, 146, 147, proximately caused her injury while depriving her and her community of any sensory warning of dangerous exposure. , *Id.* ¶¶ 90-94. The absence of an odorant—which is a standard feature across many gaseous explosives and toxins—is a deliberate design choice subject to the risk–utility balance, not a challenge to the product's existence. Adding an odorant is a safety-enhancing modification that preserves EtO's sterilizing function while reducing the risk of undetected exposure. *Id.* ¶¶146-147). Whether the claimed "purity" outweighs the safety benefit of detectability is for Balchem to prove under the risk–utility test. They cannot avoid that inquiry by relabeling the omission of a feasible safety feature as an attack on the product itself.

Balchem's reliance on *City of Philadelphia v. Lead Indus. Ass'n*, 1992 WL 98482 (E.D. Pa. Apr. 23, 1992), is also misplaced. Unlike in *Lead Indus.*, where the plaintiffs challenged the inherent nature of lead pigments and proposed an entirely different product (zinc-based pigments), Plaintiff here alleges that the sterilant product itself could and should have been designed and formulated in a way that minimized its foreseeable risks. This is not an attack on the product's mere existence, but rather a plausible claim that its design lacked reasonable and readily available safety features.

Finally, Balchem's argument that Plaintiff's alternative design could not be the "same registered, EPA product," is not only premature at this stage but also legally irrelevant and fundamentally flawed since Plaintiff has already met her initial burden as discussed above. Puerto Rico's strict liability standard asks whether a reasonable, safer alternative design existed, not whether that alternative would be covered under the same EPA registration. That limitation appears nowhere in the applicable legal framework. It stems solely from the regulatory process for pesticides, not from the substantive law governing design defects. Accepting Defendant's position would create a de-facto immunity for manufacturers of hazardous, highly regulated products, because almost no alternative design, no matter how life-saving, would be pre-approved under the same registration.

Balchem could and should have adopted a safer, reasonable alternative design that incorporated an odorant, consistent with longstanding safety practices for other hazardous gases, to alert surrounding communities to dangerous leaks while still satisfying EPA and FDA standards, *Id.* ¶¶146–147). Federal regulations already mandate odorization for other combustible gases, such as natural gas, under 49 C.F.R. § 192.625, precisely because adding a chemical odorant is a proven and feasible means to detect leaks and prevent harm. This requirement has been mirrored by state laws, utility codes, and international safety standards, reflecting the global baseline that odorless ultrahazardous gases are unacceptably dangerous when there is a risk to residential populations. That Balchem's safer design may have required an amended or new registration does not render it unreasonable under Puerto Rico law. It simply underscores that Balchem made a deliberate design choice not to prioritize the basic safety safeguard that could have prevented Plaintiff's injuries.

Finally, the absence of an odorant in Balchem's product directly caused Plaintiff's injuries by depriving her of any sensory warning that would have allowed her to detect and avoid harmful

exposure. As alleged, Plaintiff lived within a thousand feet of the Steri-Tech facility since its opening in 1986, and within a mile since 2012 to the present, while undetectable EtO emissions contaminated the air surrounding her home, *Id.* ¶¶11-13, 22). Had the product been odorized, the presence of toxic gas could have been detected promptly, alerting Plaintiff to a cause of concern, and enabling protective measures that would have reduced or prevented the prolonged exposure that caused Plaintiff's breast cancer and increased her risk of future illness.

### D. PLAINTIFF HAS ADEQUATELY PLED A FAILURE TO WARN CLAIM.

Puerto Rico law requires that a plaintiff alleging failure to warn show: (1) the manufacturer knew or should have known of the risk; (2) warnings were absent or inadequate; (3) the absence of warnings made the product inherently dangerous; and (4) the absence of adequate warnings was the proximate cause of the injury. *Cruz Vargas v. R.J. Reynolds Tobacco Co.*, 348 F.3d 271 (1st Cir. 2003) (citing *Aponte Rivera v. Sears Roebuck*, 144 D.P.R. 830 (1998)). Plaintiffs have pled all four. Balchem argues that their label and SDS provided Steri-Tech "adequate" warnings on the risks of EtO, and it was not required to provide additional warnings beyond those mandated by the EPA and OSHA. Additionally, it argues that the Amended Complaint allegations fail on causation grounds because Plaintiff alleges that Steri-Tech knew or should have known of the risks of EtO. Both assessments are wrong.

#### 1. Puerto Rico Law Recognizes a Duty to Warn Risk to Foreseeable Bystanders

In *Aponte Rivera*, the Puerto Rico Supreme Court held that a product is defective for failure to warn when the warnings omit foreseeable risks arising during ordinary use. These foreseeable risks that extend to persons who may simply be *near* the product at the time of the hazard. Although the Court never used the word "bystander," its reasoning unmistakably encompassed them. After finding that the battery's warnings "warned in general terms of the inherent dangers of the product"

but "did not contain information about the danger of moving the terminal connectors immediately before attempting to start the car," the Court emphasized that "neither were there any instructions with regard to the prudent distance that a person who was near the automobile should have kept when attempting to start the vehicle after moving the battery terminal connectors, which would have prevented the injuries." *Aponte Rivera*, 144 D.P.R. at 846. This holding confirms that in Puerto Rico, the manufacturer's obligation to warn extends beyond the immediate user to protect innocent people foreseeably exposed during a product's use.

The same rationale applies with even greater urgency to EtO fugitive emissions. In *Aponte Rivera*, the danger to a nearby person was momentary and involved "an inherently dangerous product" whose risks, though serious, were tied to a brief ignition event. By contrast, EtO is a carcinogenic, mutagenic, colorless and odorless gas; the foreseeable victims include not only facility workers but residents living near sterilization plants. If Puerto Rico law imposes a duty to warn about the prudent distance a person should keep when standing a few feet from a car battery for seconds, it necessarily encompasses the obligation to warn communities living day and night continuously being exposed to facilities emitting a toxic gas far more dangerous than the brief potential-hazard in *Aponte Rivera*. Under this framework, protecting "those who may reasonably and foreseeably" be exposed, failure to warn the facility's operators (the end users) of the risks that fugitive EtO emissions pose to the surrounding community is an even more egregious breach, as it deprives those in control of the emissions of the information necessary to prevent harm to an entire population foreseeably within the zone of danger.

## 2. Balchem's Warnings Ignored the Foreseeable Risk of Fugitive EtO Emissions

Balchem mischaracterizes Plaintiff's allegations. Ms. Garcia does not claim Balchem failed to state that EtO is "dangerous, toxic, and/or carcinogenic" in a generic sense. See, ECF No.

38 at 13. Rather, Plaintiff alleges that Balchem failed to provide adequate and complete warnings regarding a distinct and foreseeable hazard: the release of undetectable fugitive EtO emissions from sterilization facilities into surrounding communities and the resulting chronic exposure risk to residents. Am. Compl. ¶¶ 15, 42, 45, 105, 132, 138, 141. The generic language on Balchem's label did not inform either the Steri-Tech's employees or the public of this environmental exposure hazard, nor did it instruct on measures to prevent or mitigate offsite exposures.

Balchem knew, or should've known, that Steri-Tech's facility was located in a populated area, *Id.* ¶ 16, and its product was both colorless and odorless. *Id.* ¶¶ 15, 57, 148. Yet its warnings contained no information on the risk of chronic low-level exposure to surrounding neighborhoods, no instruction on monitoring for fugitive emissions, and no feasible community-focused safeguards such as odorization to allow detection of leaks. *Id.* ¶¶ 15, 19, 41.

### 3.  EPA Label Approval Does Not Immunize Balchem from Liability.

Balchem's argument that EPA approval of its label and SDS forecloses Plaintiff's claims misreads both the law and *Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005). In *Bates*, the Supreme Court rejected the view, adopted by the Fifth Circuit below, that any state-law claim is preempted if a verdict "would induce [the manufacturer] to alter its label." *Id*. at 444. The Court held that FIFRA's preemption provision, 7 U.S.C. § 136v(b), bars only those state-law labeling or packaging requirements that are "in addition to or different from" federal requirements—not those that are equivalent or parallel to them. *Id*. at 447.

Crucially, the Court explained that "[n]othing in § 136v(b) precludes States from providing [a damages] remedy" for violations of FIFRA's misbranding standards, and that such suits "may aid in the exposure of new dangers" and "lead manufacturers to petition EPA to allow more detailed labelling." *Id*. at 448, 451–52. In other words, EPA label approval is not a shield against liability

when a manufacturer could have lawfully supplemented or clarified its warnings to meet its independent duty. See*, Id.* at 439 (§ 136a(f)(2) makes clear that registration "does not provide a defense to the violation of the statute").

This reasoning applies squarely here. Under 40 C.F.R. § 152.46, Balchem could have, without prior EPA approval, added clear, protective instructions prohibiting uncontrolled or under-controlled EtO venting. *Bates* confirms that federal law does not forbid such lawful, supplemental warnings, and that a state-law claim premised on the omission of those warnings is not preempted so long as it parallels the Federal statutes' own prohibition (e.g., failure to include adequate warnings). Balchem does not dispute that it had this regulatory pathway; it simply chose not to act. Under *Bates*, that choice supports the finding of liability notwithstanding EPA registration.

### 4.  Federal Law Expressly Authorizes Additional Protective Warnings

Balchem's own argument ignores a critical point: EPA regulations explicitly allow antimicrobial pesticide registrants to make certain label modifications without prior Agency approval, including clarifying directions for use or adding precautionary statements to prevent unreasonable adverse environmental effects. See, 40 C.F.R. § 152.46(a)–(b). These "notification" and "non-notification" changes exist precisely because the EPA recognizes that circumstances may arise requiring additional, situation-specific warnings beyond the baseline label. As alleged in the Amended Complaint, Balchem could have—and should have, without violating EPA regulations, added clear instructions prohibiting the uncontrolled venting of EtO. See, Am. Compl. ¶ 77. These changes would have directly addressed the foreseeable community exposures at issue here.

Balchem does not dispute that such permissible modifications were available; it simply chose not to implement them. This is not a case where regulatory constraints tied the manufacturer's hands. Rather, it is a case where the manufacturer, despite actual knowledge of the

risk and the existence of a lawful vehicle to mitigate it, failed to act against foreseeable harm to community members like Plaintiff. That conscious choice—foregoing feasible, legally permissible changes that could have prevented or minimized off-site exposures—squarely supports Plaintiff's prima facie failure-to-warn claim.

Finally, whether Balchem's label and SDS were "adequate" in the context of these community exposures is a quintessential question for the trier of fact, not a pleading-stage determination. The mere presence of generic hazard statements does not establish as a matter of law that the warnings were sufficient. This is particularly true where the warnings omitted any instruction or prohibition directly aimed at preventing uncontrolled environmental releases.

### 5. OSHA Employer Duties Do Not Extinguish Balchem's Independent Duty to Warn

Balchem's reliance on OSHA's Ethylene Oxide Standard is misplaced. While 29 C.F.R. § 1910.1047(j) requires employers to ensure that each employee has access to product labels, SDSs, and appropriate training, that provision does not displace the independent duty of a chemical manufacturer to provide adequate warnings in the first instance. Balchem, not Steri-Tech, authored the EtO label and SDS. If those materials were incomplete or misleading as to the hazards of fugitive emissions or the measures necessary to prevent uncontrolled releases, then the downstream employer's duty to communicate warnings simply perpetuated Balchem's initial inadequacy.

Moreover, Balchem voluntarily assumed legal duty through Steri-Tech's workforce when it undertook to train those employees on safe use of EtO. Under well-settled principles, including the Restatement (Second) of Torts §§ 323 and 324A, one who undertakes to render services for the protection of another's safety must exercise reasonable care in doing so. Having elected to provide safe-use training, Balchem was obligated to do so in a manner that fully and accurately conveyed

the risks of EtO, including uncontrolled venting of EtO into the open air and the controls necessary to mitigate those risks. Balchem cannot invoke OSHA to shield itself from liability for training that omitted critical hazard information or understated the danger posed by EtO emissions.

### E. PLAINTIFF'S NEGLIGENCE CLAIM IS VIABLE AND SUPPORTED BY PUERTO RICO LAW

#### 1. Balchem Assumed a Duty Through Its Own Training and Product Stewardship

Balchem's motion rests on the flawed assertion that Plaintiff failed to "allege Balchem had a duty or breached a duty of care". ECF No. 38, p. 18. Both assessments are incorrect. Throughout her Amended Complaint, Plaintiff clearly alleges that Balchem assumed a duty when it chose to provide "product stewardship" training to Steri-Tech employees ("Balchem, having voluntarily undertaken to provide "product stewardship" training to Steri-Tech regarding the handling of ethylene oxide, assumed a duty to exercise reasonable care in performing that undertaking" Am. Compl. ¶ 73; "Balchem assumed an ongoing role in the practices that led to harmful emissions. These training courses were not incidental; they contributed to how EtO was managed at the Facility and, by extension, to the contamination affecting the surrounding community". Am. Compl. ¶ 8).

Balchem also claims that Plaintiff failed to "identify any duty of care Balchem owed to Plaintiff", ECF No. 38, at 18. But Puerto Rico law does not insulate a manufacturer or supplier that affirmatively undertakes training and product stewardship, performs those acts negligently, and thereby substantially contributes to the risk of harm to surrounding residents. Plaintiff has pleaded specific allegations of Balchem's duty, breach, causation, and damages. See, Am. Compl. ¶¶ 72–74, 76, 78, 102–104, 133–134, 141, 158 (alleging that Balchem, having voluntarily undertaken to provide product stewardship training and guidance on EtO handling, assumed a duty of reasonable care to prevent foreseeable harm to surrounding communities); *Id.* ¶¶ 47, 49–50, 59,

71, 78–79, 105, 113, 139 (detailing Balchem's inadequate training and failure to implement safeguards as breaches of that duty); *Id.* ¶¶ 8, 11, 49, 79, 139 (alleging that Balchem's deficient training and warnings contributed directly to unsafe emissions causing community-wide EtO exposure); *Id.* ¶¶ 11, 42, 79, 89, 136 (alleging Plaintiff's injuries and damages, including increased cancer risk, arising from Balchem's negligent conduct)). Accordingly, Plaintiff has met her burden at the pleading stage.

Balchem leans on *Jiménez-Ruiz v. Spirit Airlines, Inc.*, 794 F. Supp. 2d 344 (D.P.R. 2011), to argue that Puerto Rico law does not recognize liability based on an "assumed duty." But their reading and reference here is cherry-picked and flawed. *Jimenez-Ruiz* centered on whether an airline could be held vicariously liable for the negligence of unrelated third parties (the airport authority and ramp owner). The court rejected vicarious liability because the claim against Spirit was based on Spirit's own negligence, its decision to let passengers disembark in unsafe conditions. *Id.* at 351–52 ("Even if WASCO and PRPA were responsible for the conditions of the mobile ramp, Spirit can still be responsible for its own acts or omissions. Spirit would still be obligated to pay damages if it were determined that it was negligent or breached its duty of care to Plaintiff, regardless of WASCO and PRPA's liability.")

Here, Plaintiff likewise alleges direct negligence by Balchem: it undertook product stewardship and training activities that directly influenced Steri-Tech's operations and failed to adequately warn or train about preventing EtO emissions that grossly endangered surrounding residents. Those are Balchem's own acts and omissions, not an attempt to pin liability on it for Steri-Tech's actions. Moreover, *Jiménez-Ruiz* undercuts Balchem's position: the Court recognized that where multiple negligent actors contribute to an injury, each can be held fully liable as a joint tortfeasor. ("In Puerto Rico, when a negligent act is caused by the actions of more than one person,

each person is a joint tortfeasor and is liable in full to the plaintiff for the harm caused." *Id*. at 352 (citing *García Colón v. García Rinaldi,* 340 F.Supp.2d 113, 126 (D.P.R.2004) (citations omitted)). That principle applies here: Steri-Tech may be liable for failing to control its emissions, but Balchem is separately liable for its negligent role in enabling unsafe practices through its inadequate training and failure to provide warnings which, in turn, resulted in dangerous emission levels. Thus, far from immunizing Balchem, *Jiménez-Ruiz* confirms that liability attaches when a defendant's own conduct foreseeably contributes to the harm.

Balchem next invokes *Muñiz-Rivera v. United States*, 204 F. Supp. 2d 305 (D.P.R. 2002), aff'd, 326 F.3d 8 (1st Cir. 2003). Their reliance is once again misplaced. *Muñiz-Rivera* expressly recognized that liability arises when a defendant affirmatively assumes supervisory responsibilities. Citing *Block v. Neal*, 460 U.S. 289 (1983), the court explained that the misrepresentation exception[5] "does not bar negligence actions which focus ... on the Government's breach of a different duty." *Id.* at 297. Thus, when the FmHA "undertook an active role in the construction of the plaintiff's home (thus going far beyond mere assurances regarding the quality of the structure), it might be held to have assumed an additional duty under the Good Samaritan doctrine." *Id.*

The claim in *Muñiz-Rivera* failed not because no duty was assumed, but because sovereign immunity under 28 U.S.C. § 2680 barred recovery. *Id.* at 313–14. That limitation is unique to the federal government. Balchem, a private manufacturer, enjoys no such immunity. And like the

---

[5] The Federal Tort Claims Act carves out a "misrepresentation" exception, which bars claims against the United States based on the government's negligent communication or withholding of information. 28 U.S.C. § 2680(h); *United States v. Neustadt*, 366 U.S. 696, 702–06 (1961). At the same time, courts have recognized that negligence claims based on a breach of an independent duty, such as duties assumed through supervision or operational control, fall outside that exception. *See Block v. Neal*, 460 U.S. 289, 296–97 (1983). Even when an independent duty exists, recovery may still be foreclosed by the separate "discretionary function" exception, which shields governmental acts involving policy judgment. 28 U.S.C. § 2680(a). These immunities reflect principles of sovereign immunity and apply only to governmental defendants. Balchem is a private manufacturer/distributor and enjoys no such protections.

government in *Muñiz-Rivera*, Balchem voluntarily went beyond passive warnings, embedding itself in Steri-Tech's operations by providing training, protocols, and guidance on EtO handling. By assuming this active supervisory role, Balchem created an independent duty to exercise reasonable care, one it cannot now disclaim.

Finally, Balchem's reliance on OSHA's EtO training provisions is misplaced. While it is true that OSHA imposes a statutory duty on Steri-Tech, as the employer, to train its employees, that obligation is independent of any duty Balchem may have assumed. OSHA does not confer immunity from negligence liability to third parties, nor does it state that an employer's duty is exclusive or precludes other actors from also bearing responsibility.

### F. PLAINTIFF'S PRIVATE NUISANCE CLAIM IS VIABLE AGAINST BALCHEM

#### 1. Conduct, Not Ownership, Determines Nuisance Liability in Puerto Rico

Balchem argues Plaintiff cannot plausibly allege a nuisance claim against it because it does not own or operate Steri-Tech's facility nor have control over the equipment used by such, and therefore could not have possibly abated the nuisance. ECF No. 38, p. 22.

But the Supreme Court of Puerto Rico has made clear that liability for nuisance is not limited to property owners. In *Ríos Mártir v. Municipality of San Sebastián*, 106 D.P.R. 172, 6 P.R. Offic. Trans. 240, 243 (1977), the Court explained that liability stemmed from the Municipality's conduct in maintaining the nuisance conditions (smoke, stench, and contamination) over the course of a decade. The Court emphasized that the harm arose from the "continuous and progressive nature" of the Municipality's indifference, which "continually renews the wrongful act." *Id.* (quoting *Arcelay v. Sánchez*, 77 P.R.R. 824 (1955)). By focusing on conduct rather than ownership, the Court recognized that any person or entity who contributes to, continues, or maintains a nuisance may be held liable.

## 2.  Balchem's Trainings Embedded Unsafe Practices That Perpetuate the Nuisance

Balchem further attempts to evade liability by arguing that, because its conduct, i.e. product stewardship trainings, occurs only intermittently, it cannot be said to perpetuate an ongoing nuisance. ECF No. 38 at 23. But this argument misconstrues the nature of nuisance law. The relevant inquiry is not whether Balchem acts daily or continuously, but whether its conduct created or contributed to a condition that persists in causing harm.

Courts have consistently held that a defendant remains liable for nuisance where its conduct contributes to a harmful condition that persists over time. In the opioid multidistrict litigation, Judge Polster rejected arguments that pharmacies could not be liable for an "ongoing" public nuisance simply because their practices changed. *In re Nat'l Prescription Opiate Litig.*, 589 F. Supp. 3d 790, 825–26 (N.D. Ohio 2022). Citing the Restatement, the court emphasized that liability attaches when the defendant's activity "resulted in the creation of a physical condition that is of itself harmful after the activity that created it has ceased," because the harm is renewed and continuous. *Id*. (citing Restatement (Second) of Torts §§ 821A, 834 cmt. e).

Here, Balchem does not even claim to have stopped its conduct; nor does it deny having provided their "product stewardship training" to Steri-Tech's employees on handling EtO every two years. ECF No. 38, pp. 1, p. 19 n. 31. It further claims that Plaintiff "cannot plausibly allege Balchem perpetuated a nuisance based on a biennial training" *See* ECF No. 38, p. 23. However, each deficient training perpetuates and reinforces the unsafe practices that expose surrounding communities to EtO at a company with high-turnover rate for employees. See, Hernández Declaration, Ex. 2, ECF No. 33-2, ¶28. That is the essence of a continuing tort: Balchem's repeated conduct contributes to a condition of ongoing, harmful exposure. Just as the opioid defendants could not avoid liability for the epidemic by pointing to changes in their later conduct, Balchem

cannot avoid liability for the decades of nuisance its practices have continually renewed. A defendant cannot avoid nuisance liability by characterizing its contributions as "infrequent" when those contributions foreseeably prolong and reinforce the underlying harm.

### G.  PLAINTIFF'S ABNORMALLY DANGEROUS ACTIVITY CLAIM IS VIABLE AS A MATTER OF LAW

Balchem does not dispute that EtO is an ultrahazardous, inherently dangerous, and/or abnormally dangerous substance, nor that the EtO-sterilization process could be considered an abnormally dangerous activity. To argue either at this stage would be facially absurd—as EtO is expressly designated as an "Extremely Hazardous Substance" under federal law, including the Clean Air Act, 42 U.S.C. § 7412(r)(3); 40 C.F.R. § 68.130, and 42 U.S.C. § 11002; 40 C.F.R. Part 355, Apps. A–B, reflecting Congress's recognition that releases of EtO may cause death, serious injury, or property damage due to its toxicity, volatility, flammability, and reactivity. Instead, it argues that Puerto Rico doesn't recognize the claim of Abnormally Dangerous Activity—it does— and, even if recognized, that they cannot be liable because they do not own or operate the facility. Both arguments fail upon cursory review of the nature of strict liability law in this jurisdiction.

First, strict liability for non-intentional torts in Puerto Rico is considered a "jurisprudential embellishment" by the Supreme Court of Puerto Rico of the basic statutory tort action contained in Article 1802 of the Puerto Rico Civil Code and "[i]n order to fill a gap in our body of laws, the Puerto Rico Supreme Court [has] adopted, through case law, the U.S. common law products liability principles ... to develop this field ... notwithstanding the fact that our legal system is rooted in the Civil Law that puts emphasis on positive or written law." *González Caban v. JR Seafood*, 132 F. Supp. 3d 274, 280 (D.P.R. 2015), certified question answered, 199 D.P.R. 234, 2017 TSPR 187, 99 P.R. Offic. Trans. 15 (Dec. 1, 2017) (citation modified). Puerto Rico has expressly adopted and takes as highly persuasive authority the product liability caselaw that has been developed in

California, which has expressly adopted the Abnormally Dangerous Activity claim under the terms of the 2d Restatement of Torts. See e.g., *Collazo-Santiago*, 149 F.3d at 25 ("As it has revisited the issue of Puerto Rico strict products liability law, the Supreme Court of Puerto Rico has consistently relied upon California Supreme Court precedent."); *Edwards v. Post Transportation Co.*, 228 Cal. App. 3d 980, 984, 279 Cal. Rptr. 231, 233 (Ct. App. 1991) ("The California utilization of the doctrine of ultrahazardous activity relies upon the exposition which has been contained in the Restatement of Torts, and is now set forth in sections 519 and 520 of the Restatement, Second Edition."). Accordingly, Balchem's first contention that the tort claim of Abnormally Dangerous Activity is not recognized in Puerto Rico is inaccurate.

Second, Puerto Rico has expressly recognized strict product liability for manufacturers of "dangerous" products. See, *Aponte-Rivera*, 144 D.P.R. at 838 ("The doctrine of strict liability of the manufacturer or seller for the damages caused by defective <u>or dangerous</u> products applies in our jurisdiction.") (emphasis added). Further, regulation of a good produced does not shield the manufacturer of that good from Abnormally Dangerous Activity liability, as articulated by favored California precedent:

> Clearly, in permitting continued use, the EPA did not arrive at a determination that PCBs are functionally safe, but rather engaged in a cost-benefit analysis for the purpose of deciding whether to regulate or prohibit the activity. The agency elected to regulate an activity involving a known toxic substance, a decidedly different question from that presented in determining whether an activity is abnormally dangerous. Even though an activity has some utility, it is for the court to decide that its unusual danger requires, as a matter of policy, that the business engaged in the activity assume the cost for the harm the activity causes. (Rest.2d Torts, § 520, com. (f).)

*Ahrens v. Superior Ct.*, 197 Cal. App. 3d 1134, 1147–48, (Ct. App. 1988).

Because California expressly recognizes this claim under the broader umbrella of strict liability torts, and because Puerto Rico jurisprudence continues to adopt Californian case law on

precisely that subject, Abnormally Dangerous Activity is a presumptively valid claim in this jurisdiction. Plaintiff had pled the elements of that claim under the relevant six factors outlined in the 2nd Restatement in at least the following ways:

| Prong | Allegations (Am. Compl.) |
|---|---|
| **1. High degree of risk of harm to others** | Balchem manufactured, packaged, and supplied 100% EtO — a chemical long classified as a human carcinogen — into a dense residential community. It instructed Steri-Tech workers on safe practices to avoid occupational exposure, who in turn vented EtO into the outside air to reduce indoor concentrations, ensuring uncontrolled releases into Salinas neighborhoods. Am. Compl. ¶¶ 1, 47, 75–76, 90–94) |
| **2. Likelihood that the harm will be great** | Balchem knew EtO causes cancers, including breast cancer and lymphoma, as well as reproductive harm, yet continued to distribute it without safeguards. Plaintiff's diagnosis of breast cancer exemplifies the grave consequences of Balchem's product decisions and directives. Am. Compl. ¶¶ 1, 78–80, 92. |
| **3. Inability to eliminate risk through reasonable care** | Balchem's own Safety Data Sheet warned EtO is "extremely flammable" and a "cancer and reproductive hazard." It nevertheless limited training to bi-annual sessions, left untrained workers with limited printed slides, and failed to implement controls preventing fugitive emissions. Because EtO is odorless and genotoxic at all levels, Balchem knew that no precautions could render uncontrolled emissions safe. Am. Compl. ¶¶ 60–62, 71, 84–88, 145–47. |
| **4. Extent to which activity is not a matter of common usage** | The commercial distribution of pure EtO is not part of ordinary experience. As the EPA's sole "technical registrant," Balchem possessed exclusive knowledge of EtO's extreme hazards — knowledge unavailable to the public it exposed through its supply and training. Am. Compl. ¶¶ 47, 58, 90, 146. |
| **5. Inappropriateness of the activity to the place where it is carried on** | Balchem enabled and directed EtO use less than 1,000 feet from homes, schools, and parks. Despite decades of science confirming EtO's dangers, it continued to supply and train for a sterilization process that vented carcinogens into a densely populated community. Am. Compl. ¶¶ 4, 47, 96–100. |
| **6. Extent to which value to community is outweighed by dangerous attributes** | While Balchem touts EtO's utility, it never identified a single device sterilized at Steri-Tech lacking safer FDA-approved alternatives. Instead, it profited from distributing odorless EtO without feasible safety modifications (such as odorants), |

| Prong | Allegations (Am. Compl.) |
|-------|--------------------------|
|       | externalizing catastrophic cancer risks onto the Salinas community. Am. Compl. ¶¶ 96–98, 145–47. |

Again, each of the six Restatement § 520 factors is satisfied by Balchem's alleged conduct, underscoring that its distribution and direction of EtO use in Salinas constitutes an abnormally dangerous activity.

## V.    CONCLUSION

Balchem effectively requests the Court to ignore relevant precedent by claiming its conduct—manufacturing, packaging, distributing, and training on ethylene oxide use in a residential area—has no consequences. This contradicts the law. Plaintiff has provided facts showing Balchem's conduct caused ongoing exposure, meeting the standards for negligence, nuisance, and strict liability, and supporting claims for defective design, failure to warn, and an abnormally dangerous activity. All of Balchem's defenses, from preemption to ownership-control claims, fail under applicable pleading standards. Plaintiff's allegations are presumed true and enough to show Balchem's misconduct exposed her and her community to carcinogenic gas for decades, causing serious harm. Therefore, Balchem's Motion to Dismiss should be denied.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 28th day of August, 2025

*/s/ Luis V. Almeida-Olivieri*
Luis V. Almeida-Olivieri (PR Bar #308307)
Melissa K. Sims (*pro hac vice forthcoming*)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, LLC**
1311 Ponce de Leon Ave. Suite 700
San Juan, PR, 00907
Tel: (516) 741-5600
Fax: (516) 741-0128
lalmeida@milberg.com
msims@milberg.com

*-and-*

John Fonda (*pro hac vice forthcoming*)
**NAPOLI SHKOLNIK PLLC**
360 Lexington Avenue, Eleventh Floor,
New York, NY 10017
Tel: (212) 397-1000
jfonda@napolilaw.com

*-and-*

Ari Kresch
(PR Bar #309614)
**Kresch Legal Services PR, PLLC**
1225 Avenida Ponce de Leon, Suite 605
San Juan, Puerto Rico 00907
Tel: (800) 529-3476
akresch@1800lawfirm.com

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I, Luis V. Almeida-Olivieri, an attorney, hereby certify that on August 28th, 2025, I caused a true and correct copy of the foregoing **PLAINTIFF'S OPPOSITION TO BALCHEM'S MOTION TO DISMISS AMENDED COMPLAINT (ECF NO. 38)** to be filed and served electronically via the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Luis V. Almeida-Olivieri*
Luis V. Almeida-Olivieri (PR Bar # 308307)